[Crim. No. 2345. First Dist., Div. One. Oct. 24, 1945.]

THE PEOPLE, Respondent, v. GERALD MELONE et al.,
Defendants; SIPIRON BALENZUELA, Appellant.

292

Alfred J. Hennessy for Appellant.

Robert W. Kenny, Attorney General, David K. Lener and Miriam E. Wolff, Deputies Attorney General, for Respondents.

WARD, J.—Appellant, Sipiron Balenzuela, was charged with burglary and grand theft jointly with Gerald Melone and Ralph Dugger in an information containing two counts. It was alleged that the articles stolen and the premises burglariously entered were the property and home respectively of Dorothie S. Kok and were located in the town of Hillsborough in the county of San Mateo. The three defendants were convicted and sentenced on each count. It was ordered that the sentences should run concurrently. Balenzuela is the only defendant to appeal.

Preliminarily it should be stated that defendant Melone and Mrs. Kok had become acquainted several years or more prior to the burglary. Melone joined the Merchant Marine in 1942 and made several trips to various places in the South Seas, including Australia. In Australia he purchased a tennis racket, and in May, 1944, when he arrived in San Francisco, he telephoned Mrs. Kok as he claims to present the tennis racket through her to her daughter. Mrs. Kok drove to San Francisco and met Melone at his suggestion at an inn or bar. Here the two indulged in a drink of a "Scotch

high ball." Mrs. Kok subsequently, through Melone, purchased a case of Scotch whisky of the value of about $70 for which she paid $100. The proprietor of the establishment testified that "somebody went south" with the difference. Mrs. Kok invited Melone to her home in Hillsborough for the weekend covering August 4th, 5th and 6th, 1944. At that time Mrs. Kok's mother was occupying the guest room in the house. Upon the arrival of Mrs. Kok and Melone near midnight, Mrs. Kok's daughter was transferred from her room to Mrs. Kok's bed, and Melone occupied the daughter's room. Melone testified that he occupied the guest room. Without contradiction in the testimony it appears that about *noon* on August 5th some conversation arose relative to jewelry and furs and Mrs. Kok said she would show some of her jewels to Melone. She proceeded to her bedroom, followed by Melone, and produced a number of articles of jewelry and several fur garments. At a later date Melone invited Mrs. Kok to attend a theatrical performance, which she refused. On August 15th, upon the statement of Melone that a certain orchestra was to open an engagement at a San Francisco hotel, Mrs. Kok accepted an invitation to dine with Melone. She drove to San Francisco in her automobile and met Melone at his suggestion at a certain inn, saloon or bar. The evidence is conflicting relative to the time consumed in this inn. Upon leaving, Melone, who had been given the keys of the car, insisted on filling the tank of the car though Mrs. Kok protested that she had sufficient gasoline for all present purposes. On arrival at the hotel Mrs. Kok alighted, entered the lobby and retired temporarily to a rest room. Meanwhile the parking of the car was left to Melone. The couple dined and danced. During the evening an announcement over the loudspeaker requested Mrs. Kok's presence at the hotel office. It was agreed that the call probably had reference to the parking of the car. Melone left the table and upon his return stated the call was about the parking of the car. They continued for a half hour or more to dance and then left. Melone produced the keys of the car and drove a short distance. After asking Mrs. Kok if she had the nerve to stand a shock, he proceeded to tell her that the call at the hotel was not about parking the car but was a telephone message that her home had been burglarized. Mrs. Kok insisted upon stopping at another hotel and telephoning her home relative to the safety of her children. A police officer answered the phone, said that

the children were all right, verified the fact of the burglary, told of the condition of the clothes closets and jewel boxes and requested Mrs. Kok's presence as soon as possible. The couple drove a short distance further when Melone said Mrs. Kok had better proceed to Hillsborough alone. She said she was nervous, afraid to drive and requested him to accompany her. Melone replied that his presence with her would cause unfavorable comment. Before he left the car Mrs. Kok asked him if he had anything to do with the theft. He replied that she was "silly." The above statements in some respects are contradictory to the testimony of Melone given on the trial but are fairly consistent with several signed statements made by Melone shortly after his arrest. On the return to her home Mrs. Kok found that her two children were not injured physically. She discovered losses in jewels and furs running into thousands of dollars. Later she suggested to a police officer that she feared Melone had something to do with the theft upon several theories, namely, his action in refraining from telling her the truth about the telephone call at the hotel, and the fact that during Melone's weekend visit a $100 bill resting near the jewel box had been missing. The officer called Melone at San Francisco on the telephone. On the trial, in response to a question relative to the nature of the conversation, the officer testified: "I called this number, and before I had a chance to answer, why, the party on the other end asked me if I was Jimmy. I said I was, and he wanted to know if I got everything. I told him I had. He asked me if the cops had caught up with them. I told him 'no.' He wanted to know if I got the hundred dollars in the drawer. I told him 'yes.' And the first thing I started to ask him where I would meet him the next day, and I could not understand the name of this club or place, so I had to ask him a couple of times. It was the Criterion Club, or something like that. I told him I would meet him the next day at twelve o'clock and that was all the conversation that night." Melone was later questioned at his home and at the Hall of Justice, admitted making preparation for the burglary and theft, but claimed that a number of people were implicated, including the owner of the stolen property. Melone mentioned Dugger's name. Inspector James P. Johnson testified: "He [Melone] said that he knew Dugger, that he had sailed in the Merchant Marine with him, he knew that he had a record in our gallery identification bureau. We went to the Bureau

of Identification. . . . We went downstairs then, were unable to locate who Balenzuela was up until this time, we went downstairs, and he had a telephone number which we checked and found it to be listed to 124 Hermann Street. Mr. Melone made a call, or two calls, and from what he told me that they were there but would not answer. So Officer Kurrell and Greely and myself immediately left and went to the premises at 124 Hermann. We rang the front doorbell. Kurrell was in the rear, Greely in the front, and I went to the front door, rang the front door, and got no response, went around to the back, and I noticed the window opened. And I obtained a ladder and placed it against the window and went through the window into the house, the flat. I saw Dugger and Balenzuela just getting up out of the bed. They had their underwear on. I went back to the window and called Officer Kurrell in and opened the front door for Officer Greely. Q. What time of the day was it when you went in and they were just getting out of bed? A. I would say it was in the neighborhood of four o'clock in the afternoon. Q. Will you continue? A. We made a search of the premises. I stayed principally with the two men. Officer Kurrell called from the front room and he said, 'I have some furs, I have located some furs.' So he came in, and I went back in there, and it is a sort of a day bed, one of those combinations three-quarter couches, with the department under where you put the bedding. We had already thrown that up, and the furs were in plain view, and I went a little bit further down in the left-hand corner of the couch and found the bag containing the jewels. . . . I asked Dugger for a suitcase, one that belonged to his father, and I packed the furs and the jewelry in the suitcase. I asked him what he had to say about this property that I had found. He said, 'I have not got anything to say. What do you want me to say? You got the stuff and you got me.' I asked Balenzuela what he knew about it. He said, 'I do not know nothing about it,' he said, 'The only time I saw that stuff was up in the Cal-Hyde last night.' . . . We brought Dugger and Balenzuela into the Hall of Justice, Room 402, and turned the property over to Chief Wisnom. In making the search of the premises, Officer Kurrell called to me and I left the dining room and went into the bedroom that they had occupied. When I got into the building at 124 Hermann, he handed me a diagram of a map, supposedly of a place in Hillsborough. I put that into an apartment of my book, and when I got back to the

hall I turned it over to Chief Wisnom. They were booked and around 5:00 o'clock that day, Gerald Melone identified Balenzuela as being the second man that he had been talking to. Balenzuela was taken into the show-up room in the Hall of Justice and Melone was on the other side of transparent glass, and he identified him as being the man that he had made reference to. I also talked to Melone about the telephone call, in fact, about his participation in this affair. He said that Mrs. Kok was short of money and requested that he have the place burglarized so that she could collect the insurance. He said that he met her in the Cal-Hyde Club about 9:00 o'clock that evening, that Balenzuela and Dugger were in the place at the time, that they left immediately. He said that he drove Mrs. Kok's car, that he made two stops to buy some gasoline, and that when he arrived at the hotel he saw Dugger and turned the keys over to Dugger. I asked him about the 'phone call that he had received from the Hillsborough Police, and why he did not tell Mrs. Kok at the time he had received it. He said that he did not wish to have a hysterical woman on his hands in the dining room. I asked him when he first told her of the telephone call. He said, 'Not until they got in the car, her car.' And I asked him how he approached and broached the subject to her. He said, 'Well, I asked her how her nerves were,' and then he told her.''

It appears that a map of the Hillsborough premises and the roads leading thereto had been drawn by Melone. It is contended that a second diagram, also the handiwork of Melone, was made with the assistance of Mrs. Kok. The latter testimony is positively denied by Mrs. Kok. In reference to the drawing, the record disclosed the testimony of Officer Kurrell: ''Q. I now show you what appears to be a form of a V-mail letter with certain lines and drawings on it, and ask you whether or not you recognize that document? A. Yes, I do. Q. And where did you find that document? A. In an inside coat pocket. Q. What kind of a coat? A. A regular suit coat. Q. At that time where was the coat? A. Hanging on the back of a chair in the bedroom where these fellows were sleeping. Q. Now, did you afterwards, after you found that document, did you notice who put on that coat? A. Yes I did. Q. Who was it? A. Balenzuela. Q. That is Sipiron Balenzuela, the man who is sitting here, one of the defendants in this case? A. That is right. Q. And did you show it to the other officers there? A. I did. Q. Whom did

you show it to? A. To Inspector Johnson and to Officer Greely. . . . Q. I will ask you to look at People's Exhibit #33 and ask you as to whether or not this indicates a portion of the Hillsborough home, or a rough diagram or drawing of the den and dining room? A. Yes it does."

On appeal the main contentions presented are that the defendant was convicted upon the uncorroborated testimony of self-confessed accomplices and that the court failed to give an instruction on the necessity of corroboration of an accomplice's testimony. Prior to the trial and subsequent thereto Balenzuela was represented by separate or at least additional counsel. On the trial the record disclosed that all defendants were represented by one set of counsel. A reading of the entire transcript shows that any evidence introduced by the prosecution or the defense or any motion or objection presented by the defense was offered on behalf of or against all defendants and not specially on behalf of or against Balenzuela. No request was made to limit the testimony to one or more defendants (*People* v. *Peterson,* 66 Cal.App.2d 420 [152 P.2d 347]) and no request was made for an instruction concerning corroboration.

Melone and Dugger appeared as witnesses for the defense but Balenzuela did not. The contentions on appeal that the testimony of Melone and Dugger tended to prove the case for the People by the admission of the entry into the premises, the taking of the property therefrom when Balenzuela was present, and the preliminary steps leading up to the denounced act, may be accepted for the purpose of determining the question whether the instruction in reference to the necessity of corroboration of an accomplice's testimony should have been given.

█ Under certain facts and circumstances the court may, and under other facts and circumstances must, on its own motion, give instructions on the subject of an accomplice and the necessity for corroboration of the testimony of such accomplice (Pen. Code, § 1111; Code Civ. Proc., § 2061; *People* v. *Warren,* 16 Cal.2d 103 [104 P.2d 1024]), but an instruction by the court on its own motion covering section 1111 is necessary only when the accomplice witness is called by the People. To give, without request, such an instruction when the accomplice witness is called by the defense may prejudice the constitutional rights of the witness by unnecessarily and inadvisedly commenting on the evidence and discrediting the wit-

ness. (8 Cal.Jur. § 357, p. 303; *People* v. *McEvers,* 53 Cal. App.2d 448 [128 P.2d 93].)

Appellant's related contention that he was convicted on the uncorroborated testimony of an accomplice is not supported by the evidence and it is, therefore, unnecessary to decide whether a person can be convicted upon the uncorroborated testimony of an accomplice, where such testimony is introduced by the defense. In this case the appearance of other defendants on the stand and the giving on the trial of testimony of the so-called accomplices was not the sole testimony relied upon by the People in their case to connect the appellant with the commission of the offense. The corroboration necessary under Penal Code section 1111, while it need do more than raise a suspicion of defendant's guilt, need only tend to connect him with the offense charged, and need not be sufficient in itself to sustain a conviction. (4 Cal. Jur.Supp. (1943 rev.) 710.) Balenzuela was sleeping in the apartment in which the stolen articles were found the day after the alleged offense. He admitted that he had been at the inn where the whole scheme was planned, according to the defense, by his statement to the arresting officers when they found the property: "I do not know nothing about it, the only time I saw that stuff was up in the Cal-Hyde last night." A rough map of the Hillsborough premises and the main roads leading thereto was found in the pocket of the coat which Balenzuela put on when he was taken into custody.

 Secondary in importance as presented by appellant is the claim that prejudicial error occurred by the court's action in refusing to permit Mrs. Kok to answer certain questions propounded by defendants' counsel. The points raised are specifically set forth in the opening brief. Question No. 1 referred to a purported loss of a "pendant watch" prior to the burglary charged in the information, to wit, on cross-examination the following question was propounded: "Q. And isn't it a fact that the insurance company paid you $950, and some odd dollars or in that neighborhood, for that watch? A. Yes. Q. And as a matter of fact, it had never been lost, is that right, too?" The question related to an entirely collateral matter that had not been developed on direct examination. The defendants could not disprove an answer, if given. The court, the district attorney, and the attorney for the defense argued earnestly for or against the admissibility of the evidence. In the midst of the argument the attorney for the defense asked: "Have you got that watch now?"

Mrs. Kok interrupted the flow of objections and answered: "I certainly have not." The particular information which counsel sought to elicit appears in the record.

Question No. 2: "How many times did he stay in your house?" That question was answered several times. As an instance: "Q. Now, Mrs. Kok, isn't it a fact that, since you have known him, and, as I say, between four and five years, he has frequently spent the week-end with you at your house in Hillsborough? A. I told you before he has only spent one week-end at my house."

Question No. 3: "A. I said Mr. Melone took me to this bar over on Market Street where I could buy this case of Scotch for this friend of mine that wanted a case of Scotch. Q. What kind of a place was that?" The particular question was technically objectionable. However, it might have been reframed. The witness had given testimony relative to the transaction at the "bar over on Market Street." In addition, Melone gave some information and the owner and operator gave particular details from which testimony it could be readily ascertained what "kind of a place" it was.

Question No. 4. "And many times you and Mrs. Kok had drinks together in that house?" The question was directed to a police officer who testified that he had occasion twice previously to visit the Kok home. The question had no bearing on the real issue in the case, namely, whether the entry to the house was with the permission of Mrs. Kok. Appellant admits that each of the above questions was directed to collateral matters but is content to claim without further elucidation that the rulings were prejudicial error. None of these matters were referred to on direct examination. "A party who has not opened his case is not permitted to do so by propounding, under the guise of cross-examination, questions which relate, neither directly nor collaterally, to the subject matter of the original examination; if he wishes to propound such questions, he should, when permitted, call the witness as his own." (27 Cal.Jur. § 77, p. 101.) "The opposite party may cross-examine the witness as to any facts stated in his direct examination or connected therewith, and in so doing may put leading questions, but if he examine him as to other matters, such examination is to be subject to the same rules as a direct examination." (Code Civ. Proc., § 2048.) (*People* v. *David,* 12 Cal.2d 639 [86 P.2d 811]; *People* v. *Montgomery,* 47 Cal.App.2d 1 [117 P.2d 437].)

The next claim of error by appellant concerns one in-

struction by the trial court. The court instructed: "In this case the defendants have come forward and under what is in the nature of a plea of confession and avoidance have said: 'Yes, we did all those things, but we did it without the intent because we did it at the behest, or at the request, or to satisfy some purpose of Mrs. Kok.' " "Now, as I say, this defense is in the nature of a plea of confession and avoidance. We did it, but we are not guilty. We are not guilty because we did it at the 'behest,' or, to use the language of some of them, 'under the orders of the owner of that property.' Obviously I do not steal from you if you give me your property. Obviously, if this property was taken at the suggestion of the owner, to satisfy any purpose, whim, or whatnot of the owner, it is not burglary and it is not theft. And you are, of course, to weigh that circumstance in connection with all of the other circumstances in this case." There is no such plea recognized in a criminal action in this state. (Pen. Code, § 1016.) The instruction must be declared erroneous. However, the court has the right to comment on the evidence. (Pen. Code, § 1093(6); Cal. Const., art. VI, § 19.) This comment is not technically in accord with law but the defense was based on a concession of entry into the home designated in the information and an admission that certain property had been removed therefrom. It was claimed that Mrs. Kok consented to the entry, etc. The jury understood the contention of the defendants and by their verdict showed they did not believe the defendants. The use of the word "plea" was technically incorrect, otherwise the statement of the position of defendants was an apt characterization. In view of these facts it may not be said that the instruction was prejudicially erroneous.

■ The final contention of appellant is "That the verdict purportedly returned by the trial jury was, and is, void, because of its being incomplete inasmuch as the clerk failed to record the verdict in full, or at all, in the official minutes and/or read the verdict, as recorded, to the jury and then inquiry made of the jury if it was their verdict as recorded, and the jury was ordered discharged without affirming the verdict as recorded." There is nothing in the present record to indicate that the verdict was not recorded in the official minutes. The presumption is that official duty has been regularly performed. (Code Civ. Proc., § 1963.) ■ However, the recording in the rough minutes, if followed expeditiously

in the official minutes so that no injury could befall the legal rights of the People or defendants, would be sufficient. (Pen. Code, §§ 1093, 1258, 1404; *People* v. *Gilbert,* 57 Cal. 96; *People* v. *Sing Chan,* 64 Cal.App.2d 167 [148 P.2d 81]; *People* v. *Kelso,* 25 Cal.2d 848 [155 P.2d 819].)

The judgment is affirmed.

Peters, P. J., and Schottky, J. pro tem., concurred.

A petition for a rehearing was denied November 8, 1945.