66 Cal.Rptr. 818]

[Crim. No. 12975. Second Dist., Div. One. Mar. 12, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JESSE RESENDEZ, Defendant and Appellant.

4

Frank P. Rosen for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Walter R. Jones, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—Jesse Resendez appeals his conviction for a lewd and lascivious act committed upon a child under the age of 14. (Pen. Code, § 288.)

Appellant was charged by information with a violation of Penal Code, section 288 and a prior felony conviction for rape. He admitted the prior conviction. The first jury was unable to reach a verdict and a mistrial was declared, but at his second trial the jury found him guilty as charged. The court ordered a probation report, appointed two psychiatrists to examine appellant for sexual psychopathy (Welf. & Inst. Code, § 5504), and later obtained additional psychiatric and probation reports. Upon the basis of the information before it, the court then found appellant to be a probable mentally disordered sex offender and committed him to Atascadero State Hospital for 90-day observation. The report from the superintendent at Atascadero found appellant to be a mentally disordered sex offender but concluded that he was not capable

of benefiting from care and treatment at a state hospital. The court thereupon resumed criminal proceedings, denied probation, and sentenced Resendez to state prison for the term prescribed by law.

The record discloses the following: Catherine Marie Clark, aged nine at the time of these events, was a neighbor of the Resendez family and frequently played with appellant's children. She lived with her mother, grandparents, two sisters and a brother in a house situated on the front of a city lot, while appellant resided with his wife and three children in a dwelling at the rear of the same lot. On Saturday morning, February 27, 1965, Catherine went to play with appellant's daughters. Although Mrs. Resendez and the two older girls were not home, Resendez, clad in regular street clothes, invited Catherine to come in. He then gave his youngest daughter, Rita, a quarter and told her to go outside. When Rita obeyed, Resendez took Catherine in his arms and kissed her on the mouth saying, "You're my girl, aren't you?" Then, while Catherine waited in the living room at his request, Resendez went into the bedroom; he returned attired in pajamas and again kissed and caressed her. Soon, however, he was startled by a noise from outside and hastened to dress again in shirt and trousers, telling Catherine to go out and play.

That afternoon, Catherine went with her mother, brother and sisters, to take her music lesson and returned around 4:30 p.m. She started to play volley ball with her sister and brother and two of appellant's children in the yard between the houses. Resendez, however, saw Catherine, who was then clad in a red shift dress over panties and slip, and once more summoned her into his house where he was alone. When she entered he kissed her on the mouth again and repeated "You're my girl, aren't you?" First he sat on a chair in the corner of the living room with her, searched inside her panties, and inserted his finger in her "private parts" which hurt her a little. Thereafter, he took her into the bathroom where he sat on the toilet seat with Catherine standing before him and repeated the procedure cautioning Catherine, "You won't tell anybody, will you, now." When Catherine promised not to tell, because she was "scared stiff" appellant unzipped his trousers and displayed his penis to Catherine, who could not avoid looking but refused to touch, although appellant grasped her hand in an effort to force her to do so.

Thereupon, appellant kissed her again, admonished her once more not to tell anyone, and let her go.

Catherine was reluctant to enter the house when, after she had returned to the volley ball game, appellant once more summoned her. Fearing harm if she failed to respond, Catherine ultimately gave in, Resendez freely kissed and fondled her while they were alone together in the house. Appellant repeated this procedure twice, but when he called her on the third occasion around 5:30 p.m. and his daughter urged her to obey, Catherine instead ran into her own home where she began to help her mother set the table.

A few minutes later Catherine's brother entered and told their mother that Catherine had been rude to Resendez by failing to obey his summons. When Catherine's mother chided her for being rude, Catherine responded only "I know what he wants and I'm scared." Catherine's mother sent her brother outside so that she might question the little girl alone and Catherine cried as she related to her mother the events of the afternoon. Her mother did not immediately call the police because she promised Catherine that she would say nothing if Catherine told her story, and she did not want the police to come for appellant while his children were present. That evening, although Catherine remained hysterical, her mother went to work as usual around 8 p.m. and told her employer about the incident. Her employer called the police, who interviewed Catherine and her mother and prepared their report on the following Monday.

Resendez' sister Leonora Jiminez testified that she and her family visited appellant on February 27, 1965, at approximately 2:30 p.m. and remained there until 6:45 p.m. Catherine's grandmother, however, testified that she saw his sister and family arrive at around 11:30 in the morning on that day and that all departed leaving appellant alone about 4 p.m.

Appellant denied Catherine's entire story and stated that she was inside his home only once on the afternoon of February 27, 1965. Appellant was sitting on the toilet reading a paper when she ran into the bathroom and, surprised, he yelled at her and "whacked her one." She left then, but he called her back a few minutes later to apologize. Appellant's wife testified that she left the house around noon on that day and did not return until after 7 p.m. No one answered when she called home around 3 p.m. but when she called again around 6 p.m. her brother-in-law (the husband of Leonora Jiminez) answered the phone. She also claimed that appellant

was extremely fond of children and customarily hugged and kissed them. Appellant's 10-year-old daughter recalled that appellant's sister had visited their home on the afternoon in question and added that Catherine had a reputation for telling lies. Another of Catherine's 10-year-old acquaintances testified that Catherine later claimed that she had sexual intercourse with appellant but this witness confirmed that Catherine had a reputation for telling lies.

A neighborhood service station attendant testified that he overheard Catherine tell other children she liked boys, had three or four boy friends, and knew all about sex. The physician who examined Catherine following the incident found her hymen intact but sufficiently stretched to permit him to insert his small finger up to the first joint.

Appellant contends that (1) the evidence is insufficient to sustain his conviction; (2) the trial court erred in limiting the scope of the cross-examination of Catherine's mother; (3) the verdict should have been vacated on the grounds of misconduct by the jury; and (4) the court abused its discretion in failing to schedule further hearings on the issue of sexual psychopathy after the filing of a report by the Department of Corrections.

 With respect to appellant's first contention, our review of the record discloses ample evidence to support appellant's conviction. Before a conviction can be reversed on the grounds of insufficiency of the evidence, ". . . 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.'" (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Butts,* 236 Cal.App.2d 817, 832 [46 Cal.Rptr. 362].)

 The circumstances of the case clearly fall within the prohibitions of Penal Code, section 288.[1] Catherine was but nine years of age; the acts alleged were patently of a "lewd and lascivious character"; and the intent to arouse sexual passions or desires is manifest from the acts described. The primary issue confronting the jury was the respective credi-

---

[1] Penal Code, section 288.

"Any person who shall wilfully and lewdly commit any lewd or lascivious acts including any of the acts constituting other crimes provided for in part one of this code upon or with the body, or any part or member thereof, of a child under the age of fourteen years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such child, shall be guilty of a felony and shall be imprisoned in the State prison for a term of from one year to life."

bility of the two principals and the determination of credibility is the province of the trier of fact. (*People* v. *Horton,* 191 Cal.App.2d 592, 599 [13 Cal.Rptr. 33]; *People* v. *Moten,* 207 Cal.App.2d 692, 695-696 [24 Cal.Rptr. 716].)

 Appellant further contends, however, that we are entitled to reverse the judgment if we find, as a matter of law, that the testimony of the complaining witness is inherently improbable (*People* v. *Robinson,* 87 Cal.App.2d 772, 774 [197 P.2d 776]), and he asserts that certain discrepancies between Catherine's testimony at the preliminary hearing and the two subsequent trials demonstrate such improbability. Only when testimony contains statements of fact generally regarded as physically impossible or is otherwise transparently false in relation to common knowledge, may it be declared inherently improbable. (*People* v. *Headlee,* 18 Cal.2d 266, 267 [115 P.2d 427]; *People* v. *Robinson, supra; People* v. *Ogden,* 41 Cal.App.2d 447, 457 [107 P.2d 50].) We may not reverse appellant's conviction merely upon a suspicion or notice of unusual circumstances in the case. (*People* v. *Horton, supra,* 191 Cal.App.2d 592, 599; *People* v. *Penrice,* 195 Cal.App.2d 360, 363 [15 Cal.Rptr. 733].) Although discrepancies indeed exist in Catherine's testimony concerning surrounding circumstances, we are constantly aware that this child was subjected to the gruelling strain of the courtroom and the precise, detailed interrogation and cross-examination which was conducted at the preliminary hearing and again at each of the two trials. It is not surprising that she became confused as to details, but it is significant that not once was she diverted from the initial account of the lewd acts which she rendered to the police within a short time after the incident. Her testimony that she was alone with appellant on February 27, although corroborated by her grandmother's observation that Resendez was alone after 4 p.m. on the afternoon in question, conflicted with appellant's testimony and that of his sister that relatives visited his home that day and stayed until evening.

''In these sex cases, because of the nature of the charged acts, it is seldom that direct corroborating evidence can be produced by either side, and the case must usually rise or fall on the credibility of the prosecuting witness and of the accused. That is peculiarly a jury question. If . . . [Catherine's] story is true, appellant is guilty of the offense charged and should be punished. If appellant's story is true, he is innocent. The jury saw these two witnesses. It was properly

instructed that such charges are difficult to disprove, and that the testimony of young girls who testify to such acts should be examined with care. In spite of these admonitions, it has found that . . . [Catherine] told the truth and that appellant did not. This finding is binding on an appellate court. The evidence is sufficient to sustain the conviction." (*People v. Goldberg*, 110 Cal.App.2d 17, 22 [242 P.2d 116].)

 Appellant next contends that the court improperly restricted the defense cross-examination of Catherine's mother. Catherine had already testified that after the day upon which she first told her mother the story which she later repeated to the police, she did not discuss the matter further with her mother. Defense counsel nonetheless inquired of her mother on cross-examination: "Now, this particular case, have you ever discussed this with Cathy other than the time that she came in and complained to you about Mr. Resendez on February 27?" The prosecution objected that this question was beyond the scope of the direct examination and the court sustained the objection over defense counsel's assertion that he intended to demonstrate bias and prejudice on the part of the mother.

 The scope of cross-examination must be limited to matters which were elicited from a witness on direct examination (*People v. Watson*, 46 Cal.2d 818, 826 [299 P.2d 243]) but the court has liberal discretionary power in this respect (*People v. Serpa*, 67 Cal.App.2d 327, 333 [154 P.2d 6]) and in cases involving sex offenses the latitude of cross-examination is frequently expanded. (*People v. Clark*, 63 Cal.2d 503, 504 [47 Cal.Rptr. 382, 407 P.2d 294].) It remains the duty of the court, however, to insure that cross-examination is kept within reasonable limits and not abused. (*People v. Pacheco*, 220 Cal.App.2d 320, 324 [33 Cal.Rptr. 735].) The court was entitled to require defense counsel to call the witness as his own (*People v. Melone*, 71 Cal.App.2d 291, 299 [162 P.2d 505]) unless the opportunity for impeachment was reasonably present. (*People v. Montgomery*, 47 Cal.App.2d 1, 19 [117 P.2d 437].) Under the circumstances of the instant case, not only could a negative response to the question be anticipated, but it is not immediately apparent how the testimony of the complaining witness would be illuminated by the proposed line of questioning of the mother, unless defense counsel hoped to elicit some expression of the mother's fear or malice toward appellant. The proposed inquiry was, in any event, ambiguous and imprecise. Defense counsel was not,

under the circumstances, unduly restricted in his examination of this witness. It is to be noted that he thoroughly explored the relationship between Catherine's mother and appellant both before and after the charges were brought; he elicited comment from the mother concerning prior disagreements and her expression of hostility toward appellant, his wife and family, including implied threats she had made against appellant, *i.e.*, that she wanted to see him put away. The court committed no error or abuse of discretion in imposing a reasonable restriction on defense counsel's cross-examination of this witness.

Appellant further contends that he was entitled to a new trial on account of misconduct by the jury. He asserts that a new trial should be granted where a juror gives false answers to questions asked him during his selection for jury service. (*People* v. *Castaldia,* 51 Cal.2d 569, 573 [335 P.2d 104]; *Gackstetter* v. *Market Street Ry. Co.,* 10 Cal.App.2d 713, 723 [52 P.2d 998].) In the instant case one of the jurors filed an affidavit and subsequently testified that another juror, Edith Robinson, told the jury during its deliberations that the same thing had happened to her. When she was 15 her stepfather had caressed her sexually and inquired, much as appellant had done, whether it felt good or hurt; Mrs. Robinson therefore believed appellant was guilty. The entire jury was present at the time these remarks were made and several of them took exception to the comments as improper. Mrs. Robinson had denied on *voir dire* that any event of a similar nature had happened to her or to any close friend or relative. She did so only because she had forgotten the incident, which had occurred at a time when she was considerably more mature than nine-year-old Catherine. The court, after hearing this testimony, rejected any further testimony by the jurors and denied appellant's motion for a new trial.

As a general rule in California, testimony or affidavits of jurors may not be used to impeach a verdict (*People* v. *Sutic,* 41 Cal.2d 483, 495 [261 P.2d 241]) unless the jurors resorted to a determination by chance (Code Civ. Proc., § 657, subd. 2) or the bias or disqualification of a juror was concealed by false answers on *voir dire.* (*Kollert* v. *Cundiff,* 50 Cal.2d 768, 773 [329 P.2d 897]; *People* v. *Lessard,* 58 Cal.2d 447, 454 [25 Cal.Rptr. 78, 375 P.2d 46].) It is the well established policy of the courts that the stability of judgments must be preserved and a juror should be permitted to impeach a verdict only when the plainest principles of justice would

otherwise be violated. (*Winningar* v. *Bales*, 194 Cal.App.2d 273, 280 [14 Cal.Rptr. 908].) Mrs. Robinson did not intentionally conceal, but had forgotten the earlier incident in her life which precipitated no legal proceedings and differed substantially from the subject case. She was then a developed adolescent whose stepfather during a moment of sexual excitement pressed her to him, fully clothed, and asked whether it felt good, but he did not feel beneath her garments.

". . . Jurors in a criminal action subscribe to an oath to render a true verdict according to the evidence. . . . Under the oath which they take they cannot without a violation thereof receive impressions from any other source. However, the crucial question is whether it can be proved as a fact or may be presumed as a conclusion of law that the verdict of the jury may have been influenced by information or impressions received from sources outside of the evidence in the case." (*People* v. *Lessard*, *supra*, 58 Cal.2d 447, 454.)

The mention of the inquiry, "Does it feel good" stimulated Mrs. Robinson's recollection and in the heat of jury deliberation she commented accordingly, not to influence the verdict improperly, but merely to shed additional light on the issue of credibility. No individual comes to jury duty with his mind a blank slate, and it is in the balanced wisdom of group experience applied to collective deliberation that the strength of the jury system theoretically lies. In fact, free expression during jury deliberation is to be encouraged and, "To allow verdicts to be defeated because of improper remarks of a juror in the course of their deliberations upon the issues under consideration would be calculated to discourage free discussion which is deemed essential to the development of a full knowledge and a ripe judgment of the jury." (*Maffeo* v. *Holmes*, 47 Cal.App.2d 292, 295 [117 P.2d 948].) Mrs. Robinson's remarks do not disclose a biased or prejudiced mind against appellant, were disapproved by the rest of the jury, showed no immediate influence on the balloting, and apparently had no substantial influence upon the ultimate verdict; hence we find no miscarriage of justice. (Cal. Const., art. VI, § 13.)

Finally, we reject appellant's contention that the trial court's refusal to conduct further hearings on his mental condition after it received the report from the superintendent of Atascadero State Hospital was improper. Following appellant's conviction, he was committed for observation as a probable mentally disordered sex offender, and following

12

observation the hospital report found him to be a mentally disordered sex offender, but indicated that he would not benefit from hospital treatment, and he constituted a danger to the health and safety of others.

It is significant that in establishing proceedings to determine and treat sexual psychopathy ". . . the primary purpose of the Legislature was to protect society against the activities of sexual psychopaths [citation], and that it was not intended to make sexual psychopathy a mitigating circumstance." (*People* v. *McCracken*, 39 Cal.2d 336, 346 [246 P.2d 913].) When the court receives a report from Atascadero that the individual, although a mentally disordered sex offender, is not amenable to treatment, ". . . the court has the alternative of imposing a criminal sentence or of instituting proceedings, including a full court hearing, looking toward the commitment of the individual to a mental hospital for care and treatment. . . ." (*People* v. *Fuller*, 226 Cal. App.2d 331, 334-335 [38 Cal.Rptr. 25].) The failure of the court to exercise its discretion to commit such an individual to treatment with the Director of Mental Hygiene (Welf. & Inst. Code, § 5512) does not constitute an abuse thereof in view of the unfavorable diagnostic report. (*People* v. *Schaletzke*, 239 Cal.App.2d 881, 886 [49 Cal.Rptr. 275].)

Appellant contends that he did not receive adequate clinical observation while detained at Atascadero to enable the superintendent to reach a reliable diagnosis. We note, however, that the court on July 6, 1966, after receiving the superintendent's report, resumed criminal proceedings, appointed additional psychiatric experts and received further independent confirmation of appellant's mental condition before determining the proper disposition of his case. Thereafter, although it is questionable whether appellant was entitled to a probationary determination in view of his admission of a prior felony conviction for rape (see Pen. Code, § 1203; Welf. & Inst. Code, § 5500.5; *People* v. *Foster*, 67 Cal.2d 604 [63 Cal.Rptr. 288, 432 P.2d 976]), the court received additional evidence at a hearing regarding probation and sentence before determining that appellant should be sentenced to prison for the term prescribed by law. Appellant was conceded the benefit of virtually every precaution prior to sentencing, and we find no abuse by the trial court of the judicial discretion with which it is vested.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.