Filed 2/7/19 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff,<br><br>v.<br><br>ADRIAN LANDERS,<br><br>    Defendant;<br><br>MANOHAR RAJU,<br><br>    Objector and Appellant. | A145037<br><br>(City & County of San Francisco<br>Super. Ct. No. 221100) |

THE COURT:

It is ordered that the opinion filed herein on January 14, 2019, be modified as follows:

1.    On page 3, in subheading "B" entitled "***Pretrial Investigation and Discovery by the Defense***", delete the words "***and Discovery****.*"

2.    On page 8, in the first sentence that starts with "Addressing specifically to the accusations of discovery default," delete the word "to" so the phrase reads, "Addressing specifically the accusations of discovery default,".

3.    On page 13, in the first paragraph, in the sentence that starts, "Alternatively, an abuse of discretion will be found if the factual findings underlying the order under review are factually unsupported," delete the word "factual."

1

The modifications effect no change in the judgment.


Dated: February 7, 2019                        _____ Acting P. J.


A145037/*People v. Landers* (*Raju*)

A145037/*People v. Landers* (*Raju*)

Trial court:           San Francisco City & County Superior Court

Trial judge:           Hon. Anne Bouliane

Counsel:

     Jeff Adachi, Public Defender (San Francisco), Matt Gonzalez, Chief Attorney, and Christopher F. Gauger, Deputy Public Defender for Objector and Appellant.

     Laura Arnold for California Public Defender's Association as Amicus Curiae on behalf of Objector and Appellant.

     Brendon D. Woods, Public Defender (Alameda), and Brian Bloom, Assistant Public Defender as Amici Curiae on behalf of Objector and Appellant.

     Elizabeth K. Barker, Supervising Attorney and Garrick Byers, Special Assignment Attorney for Alternate Defender Office of Contra Costa County as Amici Curiae on behalf of Objector and Appellant.

     George Gascón, District Attorney (San Francisco), Louise Ogden, Assistant District Attorney, and Joseph Frislid, Assistant District Attorney for Plaintiff.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff,<br><br>v.<br><br>ADRIAN LANDERS,<br><br>        Defendant;<br><br>MANOHAR RAJU,<br><br>        Objector and Appellant. | A145037<br><br>(City & County of San Francisco<br>Super. Ct. No. 221100) |

The trial court imposed a $950 sanction on Deputy Public Defender Manohar Raju, counsel for defendant Adrian Landers in a two-defendant joint criminal trial, for violating a reciprocal discovery order. The court found that Raju failed to disclose to the People the name and statements taken from Talika Fletcher, a witness called by Landers's co-defendant, Dylan Lemalie.

Raju contends the sanction order was improper because he never intended to call Fletcher at trial, and in fact did not call her. Rather, he contends, he relied on a state-of-the evidence defense for Landers, putting on no affirmative defense case and eliciting what he needed through cross-examination of various witnesses, one of whom was Fletcher. We conclude Raju did not violate the reciprocal discovery order, and accordingly, shall reverse the sanctions order.

## I.  BACKGROUND

A formal sanctions order of any kind necessarily tarnishes an attorney's reputation, the most precious professional asset any member of the bar possesses. (*Cooter*

*& Gell v. Hartmarx Corp.* (1990) 496 U.S. 384, 413 (conc. & dis. opn. of Stevens, J.) (*Cooter & Gell*).) Just as it is the duty of the court imposing sanctions to do so only when truly warranted, it is our duty on appeal to review the facts of such a case with great care to determine whether the sanctions were properly imposed. We thus recite the facts of this case in some detail.

## A.      *Charges, Defenses, and Procedural History*

Raju represented Landers on charges he carried an illegal firearm and was an aider and abettor in the September 16, 2012 shotgun slaying of Jesus Solis by Lemalie. Both Lemalie and Landers were charged with murder under Penal Code section 187, subdivision (a).[1] The murder charge against Landers was discharged at the preliminary hearing due to insufficient evidence, but was later re-filed by amended information in early February 2014. A section 995 motion seeking to strike the amendment was heard and denied, and a few weeks later, on March 4, 2014, the case was assigned to Judge Anne Bouliane for trial.

Relying heavily on a collection of video surveillance clips taken on the afternoon of the shooting, the People argued at trial that Solis, his girlfriend Sara Herrera, and his friend Hugo Fuentes, encountered Lemalie and Landers on Kamille Court, near the Bernal Dwellings public housing complex. According to the People, both Landers and Lemalie were armed, Landers with a handgun and Lemalie with a shotgun. At first there was an exchange of threats at a distance between Fuentes and Landers, and then, in a "coordinated attack," Landers chased Solis towards the corner of 26th and Treat, where a waiting Lemalie shot him to death.

Lemalie argued self-defense. He contended that Solis and Fuentes, known to him as members of the Norteño street gang, arrived in the Bernal Dwellings neighborhood looking to stir up trouble; that they had threatened to "blow up" the neighborhood a few weeks before the shooting; that, watching Fuentes from a distance, Lemalie saw Fuentes

---

[1] Unless otherwise specified, all further statutory citations are to the Penal Code.

put his hands in his waistband, appearing to grab a weapon, while yelling racially-charged taunts and beckoning nearby compatriots to back him up; that Lemalie was fearful, so he went in his house and grabbed a shotgun; that when he came out, Solis charged toward him at the corner of 26th and Treat, yelling threats and holding a metal object (Lemalie thought it was a gun, but it turned out to be a knife); and finally that, to save himself, Lemalie fired two shotgun blasts at Solis, killing him.

Landers argued a variation on this defense, putting the exact locations of the events near Bernal Dwellings the afternoon of the shooting into sharp focus. He contended that the Norteños came into the neighborhood armed, and started trouble separately, in different places; that he was not present at the corner of 26th and Treat when Solis was shot; that he didn't see or talk to Lemalie before the street confrontation with Solis and had no idea it even happened; that, when the shooting occurred, he was in a different location, involved in a confrontation with a gun-wielding Fuentes; that in the video clip of him running, he was fleeing from Fuentes, headed in a direction away from Solis; and that only after hearing shots fired did he go to 26th and Treat, where Lemalie handed him a shotgun, which he held for only few seconds before tossing it under a parked car.

At the conclusion of trial, the jury returned a verdict convicting Landers of illegal possession of a firearm,[2] but failed to reach any verdict on the remaining counts. The case subsequently resolved through a plea to accessory after the fact by Landers and a plea of manslaughter by Lemalie.

## B. *Pretrial Investigation and Discovery by the Defense*

In early January 2014, Raju's investigator, Timothy Kingston, met with Fletcher and her mother Joyce Allen to talk about what they had seen on the day of the shooting. Both women indicated that they had been nearby but did not witness what happened. They went outside and saw some of the aftermath. Both stated that they had seen a

---

[2] Landers appealed his gun conviction, which we affirmed in an unpublished opinion. (*People v. Landers* (May 31, 2017, A142513) [nonpub. opn.].)

Latino waving a gun around after the shooting. They also offered background information about people involved, "some relevant and some not."

On February 26, 2014, Kingston went back to interview Fletcher and Allen, this time accompanied by Raju. Fletcher and Allen reviewed the videotape of the shooting and identified themselves in it, as well as other individuals. Among those individuals was a person named "Wes" or "Wesley" who lived a few doors down from Fletcher. Also shown on the video tape, according to Fletcher, was Wesley's brother, and a person known as Quis, to whom Landers tossed some keys. Kingston was of the opinion that neither Fletcher nor Joyce Allen would be particularly a good witness because each had a difficult time staying on topic. He described his interview with them as "long[,] winding[,] and convoluted."

Sometime "prior to March 2014," according to a declaration filed by Mark Goldrosen, Lemalie's attorney, Raju told Goldrosen that Fletcher had seen Fuentes brandishing a firearm shortly after the shooting. Goldrosen decided Fletcher was an important witness because her testimony corroborated the defense theory that Fuentes and Solis were both armed and posed threats to Lemalie before he shot Solis in self-defense. Although Goldrosen had not yet personally interviewed Fletcher, based on Raju's representations he included her on his witness list, which was filed March 10.

In "early March," according to Goldrosen, he arranged for his investigator to subpoena Fletcher and to confirm that she had seen Fuentes with a gun. When Goldrosen's investigator was unable to locate Fletcher, Raju arranged for one of his "neighborhood connections" to facilitate an interview. On March 13, 2014, Raju was present when Goldrosen's investigator met with Fletcher. At this meeting, Fletcher confirmed she had seen Fuentes with a gun. After receiving a verbal report from his investigator the same day, Goldrosen emailed prosecutor Heather Trevisan a summary of Fletcher's interview, along with her home address. On March 27, Goldrosen personally met with Fletcher and confirmed what she had seen on the date that Solis was shot. And on March 29, Goldrosen emailed these statements to Trevisan.

4

**C.**     *In Limine Motions and Discovery Order*

Because Trevisan had received virtually no discovery from Raju by March 2014 even though the case was filed in September 2012, she was suspicious. To that point, the only discovery she had received from Raju were disclosures of a potential expert witness and a witness who might testify that he picked up Landers on the day of the murder for a 49ers football game. Concerned that "this specific attorney regularly failed to disclose evidence admitted at trial," Trevisan included in her trial brief a written motion in limine for compelled defense disclosures under section 1054.3.

On March 13, 2014, a week before trial, Judge Bouliane orally granted Trevisan's discovery motion, compelling each defendant to disclose the following: "(1) The names and addresses of all persons defendant intends to call during trial . . . [¶] (2) Witness statements or reports of statements, no matter how recorded or by whom recorded of all witnesses the defense intends to call at trial . . . [¶] (3) Expert reports including the results of physical or mental exams . . . [¶] (4) Unrecorded statements of witnesses." The fourth prong of the order, as framed in the motion, and as granted, was a catchall, without anything limiting it to witnesses the disclosing defendant intended to call.[3]

Upon issuing this reciprocal discovery order, Judge Bouliane emphasized that counsel should produce all witness statements of which they were aware, whether written or not, and prefaced the announcement of her ruling with the cautionary statement, "I don't think I need to say this to you, folks, but something happened in another trial. I was very distressed by it. If something new comes up, do not bring it up in front of the jury the first time before mentioning it to the court."

_____

[3] As authority for these discovery orders, Trevisan cited, respectively, for no. 1, section 1054.3, subdivision (a); for no. 2, section 1054.3,subdivision (a), *Thompson v. Superior Court* (1997) 53 Cal.App.4th 480, 482, and *In re Littlefield* (1993) 5 Cal.4th 122 (*Littlefield*); for no. 3, section 1054.3, subdivision (a), *People v. Lamb* (2006) 136 Cal.App.4th 575 (*Lamb*); *Roland v. Superior Court* (2004) 124 Cal.App.4th 154 (*Roland*); and for no. 4, *Lamb*, *supra*, 136 Cal.App.4th at p. 580, and *Roland*, *supra*, 124 Cal.App.4th at p. 165.

**D.** *The Dispute Among Counsel Following Opening Statements*

Opening statements commenced March 20, 2014, and "something new" did come up that had not been mentioned to the court. Whether Raju was responsible for the ensuing dispute, or Trevisan was, became a matter of intense debate centering on surveillance video clips shown by Trevisan during her opening, and Raju's response in his opening.

In one clip shown by Trevisan, Lemalie could be seen shooting Solis with a shotgun. Using a different clip, taken from a different camera, at a different angle, Trevisan told the jury that prior to the shooting Landers could be seen running towards Solis and pointing a gun at him. After Landers "spots" Solis, she contended, he "chase[s] him back into the path of Lemalie," who then shoots him.

Raju, on behalf of Landers, embraced Goldrosen's self-defense theory—since that defense, if successful would eliminate any aiding and abetting exposure Landers might have—but also contended that the full, uncut version of the video clip shown by Trevisan would disprove Trevisan's claim of Landers's role in the shooting. Pointing out that Trevisan had mischaracterized the video, Raju took the position Landers did not herd anyone towards Lemalie. Interpreted correctly, Raju contended, the video showed Landers was not chasing Solis, but was himself *being chased* by Fuentes.

While fleeing Fuentes, Raju told the jury, Landers ran past a person wearing an Alex Smith 49ers jersey. Drawing upon details learned in the February 26th interview of Fletcher, including the detail that Landers at one point threw keys to Quis, Raju claimed Trevisan was wrong about the people depicted in the video clips she showed. The person in the Alex Smith jersey, according to Raju, was not Solis, who was wearing a Jerry Rice jersey. He was the brother of another individual who was also at the scene, someone identified only as "Wesley."

In addition, Raju devoted some of his opening to discussing Landers' ties to the community and his extensive family in the area of the Bernal Dwellings. Landers was familiar with the neighborhood, Raju claimed, and often took his little brothers to play soccer in Garfield Park. According to Raju, the evidence would also show that Landers

6

knew store owners, including Omar Nadel, and had a friend, Luis Morales, who was mentoring Landers in auto mechanics in the neighborhood.

Raju turned out to be right about the identification of who could be seen on the video, and the People make no attempt here on appeal to argue the point, referring in their responding brief to "the People's mistake" and Raju's knowledge of "exactly who the People were misidentifying." The mystery man in the video clip that sparked the dispute among counsel during opening statements would later be identified at trial as Eric Jones, Wesley's brother, who Raju had personally represented years before Lemalie and Landers were tried. Wesley, who was called by Goldrosen as a witness for Lemalie, gave the identifying testimony under direct examination by Goldrosen.

But all of this had yet to occur when opening statements were given, and what started as a kerfuffle over remarks to the jury about the video evidence during openings eventually led to the post-trial sanctions order now under review. Based on the level of detail in Raju's remarks, Trevisan lodged repeated objections throughout his opening, largely based on lack of discovery. At a sidebar, Raju explained he had been surprised by Trevisan's theory that Landers had herded Solis toward Lemalie. The discussion devolved into finger-pointing, with Raju claiming Trevisan had misrepresented the evidence, and Trevisan claiming Raju had failed to provide discovery concerning any of the individuals he mentioned during his opening and must be planning an ambush.

Raju admitted he had seen the video before, but after talking to people in the community he had figured out the identity of those shown in it. He claimed he had been telling the prosecution for months there was no evidence that Landers had chased Solis. To prove the misidentification, he insisted he could use a witness "[w]ho's already been disclosed" to testify. According to Raju, Trevisan relied on a different video clip in her opening statement than the one the People used at the preliminary hearing, saying "out of thin air that [Solis] is the person . . . Landers is chasing." Faced with a new spin on the video evidence, Raju contended, he decided he had to prove who was who on the clip used by Trevisan in opening, so he responded in kind with specific facts he thought he could elicit on cross-examination.

7

Addressing specifically to the accusations of discovery default, Raju argued he had no duty to disclose what he knew about who was shown on the video, and for emphasis, he added in any event that the video was evidence belonging to the prosecution, not the defense. At this point, Judge Bouliane halted the discussion, advising Raju, "this is a little disingenuous. Okay. We're stopping now. I want you to know that I'm aware. I have some concerns." She admonished Raju that if and when he had any witnesses who were not previously disclosed, he would have to talk to the court prior to calling them before the jury.[4]

### E.    *Post-Trial Contempt and Sanctions Proceedings*

Following trial, the People filed a motion seeking a contempt finding and imposition of monetary sanctions against Raju for 19 separate discovery violations, including that he allegedly failed to disclose the identity and statements of Fletcher. The motion sought a wide range of remedies, starting with a fine of up to $1,000 for each

---

[4] The same accusations of discovery non-compliance by Raju surfaced again at later points in the trial, most concretely during Fletcher's testimony. But before Fletcher took the stand, one other instance is particularly notable. On March 26, in a colloquy outside the presence of the jury, Judge Bouliane inquired of counsel, "Let me just ask you where are we on the witness issues?" That led to a lengthy discussion in which Trevisan repeated her lack-of-discovery objections and suggested Raju was planning to present "surprise witness[es]." In further discussions with counsel outside the presence of the jury on March 28, Judge Bouliane indicated "I reviewed again the opening statements, and I have some concerns that some specific witnesses were mentioned, in particular Jones, the previous client, Mr. Raju, of yours in your opening statement without any discovery being given over." Raju and Goldrosen then made confidential in camera proffers to try to explain the circumstances under which Raju had relayed information about Fletcher and the Jones brothers to Goldrosen, which both defense attorneys told the court arose as a result of late-breaking investigative developments and involved no coordinated plan between them. These in camera proffer sessions were purely record-making exercises. The court made no ruling following their completion. And because they took place at counsel's request for the express purpose of sharing core work product information with the court (see section 1054.7), the transcripts were sealed.

contempt, a jail sentence of up to five days, and a disciplinary report to the State Bar.[5] On the showing made by the People, Judge Bouliane issued an order to show cause (OSC) why Raju should not be found to have willfully violated a court order under Code of Civil Procedure sections 1209 and 1211, and, or in the alternative, sanctioned under Code of Civil Procedure section 177.5.[6]

Proceeding in two steps on the OSC, the court first heard arguments from the parties, and then heard testimony from defense expert witness Peter Keane. Keane opined that Raju did not do anything unethical or otherwise engage in discovery abuse. In Keane's opinion, turning over a statement of a witness, when there is no intent to call the witness, is a violation of an attorney's statutory duty of loyalty to his client. It would also have been a violation of the ethical responsibility of an attorney to "protect the secrets of his client." According to Keane, there is also no rule that requires an attorney to turn over statements of a witness that their codefendant intends to call or does call.

Keane thought Raju engaged in "good advocacy," explaining that "if you can convince or cajole or in some way influence a co-counsel to go ahead and put on material that you want that's going to help, there's nothing unethical about that. I think that's

---

[5] The motion pulled no punches. The People contended that "Mr. Raju's abuse of the discovery process could not be more egregious. At a minimum," they claimed, "he failed to [disclose] any of the evidence discussed in his opening statement prior to March 20, 2014. Mr. Raju violated both the self-executing obligation of reciprocal discovery under California law, and under the Court's *express order* to produce any and all discovery Mr. Raju would rely on for trial, entered on March 13, 2014." Despite the March 13, 2014 discussion Judge Bouliane had with all counsel about the importance of pretrial disclosures, the People argued, "Raju never produced any evidence prior to trial." The People contended that Mr. Raju must have known how he would respond to the People's herding theory "long before" entry of the March 13, 2014 reciprocal discovery order. But "even assuming Defendant [*sic*.] argues that he did not 'reasonably intend' to introduce the evidence prior to opening statement, which is laughable, Defendant [*sic*.] never even produced the evidence until defense witnesses were testifying, if at all."

[6] Before submitting his opposition to the OSC, Raju moved to unseal the confidential in camera proffers he and Goldrosen made to the court on March 28. That motion was granted.

good, clever in no negative sense. That's good, clever, effective, artful advocacy." Keane pointed out that Raju did, in fact, turn over the witness statement when directly ordered to do so by the court. He pointed out that Raju also followed the advice of his supervisor, Robert Dunlap, a very experienced trial attorney, who had encouraged Raju to undertake a minimal defense in the case and advised him not to call Fletcher as a witness.

Following this bifurcated set of hearings, Judge Bouliane ultimately issued a detailed 19-page order addressing only the issue of sanctions, without reaching contempt and without addressing 18 of the 19 alleged violations of its March 13, 2014 reciprocal discovery order. Under Code of Civil Procedure section 177.5, she found Raju violated the order in one respect, a violation she characterized as "the most obvious." That single violation was for failing to identify Fletcher as a witness as required by section 1054.3. Judge Bouliane acknowledged Raju's argument that Goldrosen called Fletcher as Lemalie's witness, but based on the test enumerated in *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 376, fn. 11 (*Izazaga*), she rejected his contention, finding that Raju "reasonably anticipate[d]" calling Fletcher as his witness, that Raju's intent to call Fletcher was formulated at the time of opening statements, and that "this omission was designed to gain a tactical advantage over the People and was done without good cause or substantial justification."

In support of her order, Judge Bouliane specifically found as follows: 1) Raju repeatedly stated that he did not intend to call any witnesses during the trial and would elicit any information through cross-examination; 2) Raju's cross-examination of Fletcher, a witness called by Goldrosen, was outside the scope of her direct examination; 3) Raju knew Fletcher had potentially "exculpatory" evidence for Landers (she could identify Eric Jones as the person in the 49ers jersey running by Landers, she saw Fuentes waving a gun around after the shooting, and she could legitimize Lander's presence in the neighborhood); 4) Raju could not be certain that Goldrosen would call Fletcher as a witness; 5) Raju referred to the "exculpatory evidence" in his opening statement; 6) Raju knew that Fletcher had this information before the trial began based on previous interviews with her and recognized the importance of the information to his case; and 7)

10

Raju hoped to avoid his discovery obligation by first persuading Goldrosen to call Fletcher as his witness and then relying on Goldrosen's assertion that he was going to call her as his witness at trial.

Raju timely appealed.[7]

## II.    DISCUSSION

### A.    *Standard of Review*

Code of Civil Procedure section 177.5 provides in relevant part, "A judicial officer shall have the power to impose reasonable money sanctions, not to exceed fifteen hundred dollars ($1,500), notwithstanding any other provision of law, payable to the court, for any violation of a lawful court order by a person, done without good cause or substantial justification."  Code of Civil Procedure section 177.5 "is fully applicable to both criminal and civil matters."  (*People v. Tabb* (1991) 228 Cal.App.3d 1300, 1310 (*Tabb*); see *People v. Muhammad* (2003) 108 Cal.App.4th 313, 323–324.)  A court is equally harmed "by the failure of a public entity's representative (such as a prosecutor or public defender) to comply with court orders as by any privately retained counsel's failure to do so."  (*Tabb, supra,* at p. 1309.)  The evident purpose of Code of Civil Procedure section 177.5 is to punish and deter violations of lawful court orders (*In re Woodham* (2001) 95 Cal.App.4th 438, 443-444 (*Woodham*), and to compensate the judicial system for the cost of unnecessary hearings (*Moyal v. Lanphear* (1989) 208 Cal.App.3d 491, 499 (*Moyal*)).[8]

---

[7] We granted the requests of the Alameda County Public Defender, the Alternate Defender of Contra Costa County, and the California Public Defender's Association to file amicus curiae briefs.  Each filed a brief, and the District Attorney filed a separate response to each amicus.

[8] Code of Civil Procedure "[s]ection 177.5 was enacted in 1982 at the request of the superior courts of Los Angeles and San Diego Counties. (Enrolled Bill Mem. Assem. Bill No. 3573, dated September 23, 1982.)  According to the author of the bill and its proponents, [the statute] was enacted to 'insure all parties are present and prepared for court appearances' and 'to help eliminate unnecessary delays in civil proceedings.' (Enrolled Bill Report, AB 3573)."  (*Seykora v. Superior Court* (1991) 232 Cal.App.3d

11

"The proper approach for evaluating" the appeal of a sanctions order entered against an attorney under Code of Civil Procedure section 177.5 is to apply its "requirements for knowing violations of valid court orders, together with the applicable Rules of Professional Conduct" and the rules of practice or procedure the sanctions order seeks to enforce. (*Conservatorship of Becerra* (2009) 175 Cal.App.4th 1474, 1481 (*Becerra*).) " '[A] trial court's exercise of discretion will not be disturbed unless the record establishes it exceeded the bounds of reason or contravened the uncontradicted evidence [citation], failed to follow proper procedure in reaching its decision [citation], or applied the wrong legal standard to the determination [citation].' [Citation.] A discretionary ruling will not be reversed merely because of a difference of opinion between the appellate tribunal and the trial judge. [Citation.] 'Inherent in our review of the exercise of discretion in imposing monetary sanctions is a consideration of whether the court's imposition of sanctions was a violation of due process. [Citation.]' " (*Becerra*, *supra*, at p. 1482.)[9]

---

1075, 1080.) Although the legislative history suggests a purpose aimed specifically at courtroom administration and efficiency, and the statute has typically been invoked in that context (*e.g.*, *People v. Whitus* (2012) 209 Cal.App.4th Supp. 1 [repeated failure to appear at trial readiness conferences]), its language in plain terms—referring to the violation of "any lawful court order"—is much broader. As a consequence, Code of Civil Procedure section 177.5 has been used to redress the violation of many types of court orders, by attorneys (see, e.g., *Scott C. Moody, Inc. v. Staar Surgical Co.* (2011) 195 Cal.App.4th 1043, 1048 [willful disobedience of court order directing attorney not to question witness about particular issue]; *People v. Ward* (2009) 173 Cal.App.4th 1518, 1529-1531 [repeated violation by attorney of court order barring use of phrase "prosecutorial misconduct" before the jury]), and by other "persons" (*Woodham*, *supra*, 95 Cal.App.4th at pp. 446-447 [failure of prison warden to comply with directive issued in habeas proceeding requiring timely response to inmate's administrative appeal]).

[9] The idea that a mere difference of opinion between the appellate and trial courts will not justify reversal of a sanctions order under Code of Civil Procedure section 177.5 reflects the practical reality that sanctions determinations often involve " 'fact-intensive, close calls.' " (*Cooter & Gell*, *supra*, 496 U.S. at p. 404; *see Woodham*, *supra*, 95 Cal.App.4th at p. 447 [prison warden's excuse for failure to comply with court order requiring timely processing of inmate's administrative appeal presented nothing more

12

While this standard of review is highly deferential to the trial court's wide discretion in determining the facts, choosing from the array of available sanctions, and deciding the severity of any sanction chosen, an abuse of discretion will be found on appeal if a sanctions order rests on incorrect legal premises (*Fox v. Superior Court* (2018) 21 Cal.App.5th 529, 533) or violates due process, matters we decide exercising our independent review. Alternatively, an abuse of discretion will be found if the factual findings underlying the order under review are factually unsupported (*Becerra*, *supra*, 175 Cal.App.4th at pp. 1481–1482), which requires us to "assess[] the record for substantial evidence to support the court's express or implied findings." (*Id.* at p. 1482.) Applying these principles of review to the unusual factual record before us, our task is to determine whether the trial court's exercise of discretion exceeded the bounds of reason. We conclude that it did. The findings underlying the sanctions order at issue here rest on legal error in several respects and are unsupported by substantial evidence.

**B.    *Reciprocal Discovery in Criminal Cases***

The statutory scheme governing reciprocal discovery in criminal cases was added to the Penal Code by Proposition 115 in 1990 and may be found at Penal Code, Title 6, Chapter 10 (§ 1054 et seq.) (Chapter 10). "The purpose of [Chapter 10] is to promote ascertainment of truth by liberal discovery rules which allow parties to obtain information in order to prepare their cases and reduce the chance of surprise at trial. [Citation.] Reciprocal discovery is intended to protect the public interest in a full and truthful disclosure of critical facts, to promote the People's interest in preventing a last minute defense, and to reduce the risk of judgments based on incomplete testimony." (*People v. Jackson* (1993) 15 Cal.App.4th 1197, 1201 (*Jackson*).) "These objectives reflect, and are

_____

than "*facts* that, at most, merely afforded 'an opportunity for difference of opinion' "], italics added.) And on appeal, we always give deference to trial court decision-making "rooted in factual determinations[,]" (*Cooter & Gell*, *supra*, 496 U.S. at p. 401), consistent with a recognition that " ' "as a matter of the sound administration of justice," ' deference [is] owed to the ' "judicial actor . . . better positioned than another to decide the issue in question." ' " (*Id.* at p. 403.)

consistent with, the judicially recognized principle that timely pretrial disclosure of all relevant and reasonably accessible information, to the extent constitutionally permitted, facilitates 'the true purpose of a criminal trial, the ascertainment of the facts.' " (*Littlefield, supra,* 5 Cal.4th at pp. 130–131.)

Chapter 10 is designed to be an exclusive statutory vehicle for discovery in criminal cases. (See § 1054, subd. (e) ["no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States"]; § 1054.5 ["[n]o order requiring discovery shall be made in criminal cases except as provided in this chapter"].) Thus, courts are "preclude[d] . . . from broadening the scope of discovery beyond that provided in the chapter or other express statutory provisions, or as mandated by the federal Constitution. . . . [I]f none of those authorities requires disclosure of a particular item of evidence, [courts] are not at liberty to create a rule imposing such a duty." (*People v. Tillis* (1998) 18 Cal.4th 284, 294 (*Tillis*).) Construing the statutory language strictly in accord with section 1054, subdivision (e), our Supreme Court has repeatedly confined discovery obligations under Chapter 10 to those expressly set forth in the statutory language.[10] We understand this preference for narrow construction to arise not just from section 1054, subdivision (e), but from the exemptions built into Chapter 10. (See § 1054.6.)[11] These exemptions reflect a careful balance struck by the Legislature.

---

[10] *People v. Thompson* (2016) 1 Cal.5th 1043, 1095 (no discovery violation when state arranged not to obtain from one defendant impeachment evidence it intended to use against co-defendant because there is no reciprocal discovery obligation as between codefendants being jointly tried); *People v. Ervin* (2000) 22 Cal.4th 48, 101 ("no statutory basis exists for the discovery [by capital defendant] of codefendants' penalty phase witnesses"); *Tillis*, *supra*, 18 Cal.4th at pages 289–294 (no discovery violation when the state failed to disclose in advance evidence it planned to use to impeach defense expert); *People v. Wilson* (2005) 36 Cal.4th 309, 333 (section 1054.1 does not require prosecution to disclose information about a witness whom the defense intends to present).

[11] Section 1054.6 provides, "[n]either the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure, or . . . are privileged

14

Section 1054.1 sets forth the prosecutor's discovery obligations, while section 1054.3, subdivision (a) sets forth those of the defense. Under section 1054.3, subdivision (a)(1), the defense shall disclose: "[t]he names and addresses of persons, other than the defendant, he or she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements of those persons . . . ." These disclosures are due "at least 30 days prior to trial[.]" (§ 1054.7.) But in some cases, as is alleged here, the obligation to disclose may arise later. Where disclosable "material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately[.]" (*Ibid.*) This timing regime, in effect, creates a continuing duty of disclosure beginning 30 days prior to trial and running through trial to its conclusion. An order enforcing reciprocal discovery obligations under Chapter 10 may be sought under section 1054.5, subdivision (a).[12]

## C.     *The Trial Court Had Post-Judgment Jurisdiction to Impose Sanctions Under Code of Civil Procedure Section 177.5*

Before turning to the application of section 1054.3 in this case, we address a

---

pursuant to an express statutory provision, or are privileged as provided by the Constitution of the United States." (See *Izazaga*, *supra*, 54 Cal.3d at pp. 381–382 & fn. 19 ["Prior to the enactment of Proposition 115, we held that the work product doctrine also applies to criminal cases. (*People v. Collie* [(1981)] 30 Cal.3d 43, 59.) The new discovery chapter recognizes this."].)

[12] Section 1054.5, subdivision (a) was not cited by the People in their pretrial motion to compel discovery, or by the trial court when it granted the motion orally, but given the exclusivity of the statutory scheme, this specific provision was necessarily the source of the court's statutory authority to issue an order a week before trial enforcing the defendants' discovery obligations. Whether that order was properly entered under section 1054.5, subdivision (a), has not been raised as an issue in this appeal. We assume that it was, all procedural objections to its entry having been waived. We note, however, that nowhere in the record is there any indication that, prior to seeking it, the People made an "informal request" for the section 1054.3 disclosures they now claim were never made. (See § 1054.5, subd. (b) ["Before a party may seek court enforcement of any of the disclosures required by this chapter, the party shall make an informal request of opposing counsel for the desired materials and information."].)

15

threshold issue concerning the availability of post-trial sanctions to address discovery violations alleged to have occurred at trial or earlier. Citing *People v. Bohannon* (2000) 82 Cal.App.4th 798, 806 (*Bohannon*), disapproved of on other grounds by *People v. Zambrano* (2007) 41 Cal.4th 1082, 1135, fn. 13, the Public Defender of Alameda County, as amicus for Landers, argues that the trial court lacked power to order monetary sanctions for a violation of section 1054.3, subdivision (a), after judgment became final. We disagree.

*Bohannon* addressed only the remedies "necessary to *enforce* the provisions of" Chapter 10, which include "immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, *or any other lawful order*," all of which are directed to rectifying a discovery default prior to or during trial. (§ 1054.5, subd. (b), italics added; see *Bohannon, supra,* at p. 805, fn. 8.) While the regime of affirmative disclosures imposed on both prosecution and defense under Chapter 10 is the exclusive statutory authority for discovery in criminal cases, the remedies for non-compliance, by the plain terms of section 1054.5, are not exclusive. And in Code of Civil Procedure section 177.5, the Legislature separately authorized the imposition of monetary sanctions for violation of a court order, civil or criminal.

Code of Civil Procedure section 177.5 confers on trial courts a limited but important reservoir of power to address affronts to the court's authority, one carrying less wallop but more freely available than the power of contempt. Sanctions under Code of Civil Procedure section 177.5 may be used as a deterrent and imposed for punitive purposes, not simply for prospective enforcement. (*Woodham*, *supra*, 95 Cal.App.4th at p. 444.) We see no reason why jurisdiction to invoke Code of Civil Procedure section 177.5 ought not to continue post-trial. Quite the contrary, there are good reasons why it should, since disabling the power to impose monetary sanctions post-trial might have the unintended consequence—as the able and experienced trial judge here clearly recognized—of allowing mid-trial sanctions issues to distract from the more important work at hand during trial, which runs contrary to one of the stated objectives of Chapter

16

10—"[t]o save court time in trial and avoid the necessity for frequent interruptions and postponements" (§ 1054, subd. (c).)  If accountability should run to the attorney and not the client, as is often the case with matters of discovery, trial is not the optimum time to hold the inquiry.

**D.     *The Sanctions Order Was An Abuse of Discretion***

Reciprocal discovery is simple in concept, but far from simple in application. "Prosecutorial discovery," in particular, "often raises complex and serious constitutional questions."  (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1167 (*Hubbard*).) While the defense obligation to provide discovery "is a pure creature of statute, in the absence of which, there can be no discovery" (*ibid.*), the corresponding prosecutorial obligation to disclose goes beyond Chapter 10 under *Brady v. Maryland* (1963) 373 U.S. 83.  It must also be kept in mind that "[l]aw enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime . . . [, while d]efense counsel has no comparable obligation to ascertain or present the truth."  (*United States v. Wade* (1967) 388 U.S. 218, 256 (conc. & dis. opn. of White, J.) (*Wade*).)

Obviously, this does not mean defense counsel is licensed to put forward false facts or tell "half-truth[s]" (*U.S. v. Nobles* (1975) 422 U.S. 225, 241), but what it does mean is that the defense always has the option of standing mute and putting the state to its proof.  (*Wade*, *supra*, 388 U.S. at p. 257 ["Defense counsel need present nothing, even if he knows what the truth is."].)  As a practical matter, therefore, section 1054.3 "does not create a symmetrical scheme of discovery" (*Hubbard*, *supra*, 66 Cal.App.4th at p. 1170), at least not in the sense of an exact match on both sides.  Chapter 10 "creates a *nearly* symmetrical scheme of discovery . . . , with any imbalance favoring the defendant as required by reciprocity under the due process clause."  (*Izazaga*, *supra*, 54 Cal.3d at p. 377, italics added.)  For the defense, unless a claimed item of discovery falls within the express terms of section 1054.3, "there is no statutory or constitutional duty on the part of

17

the defendant to disclose anything to the prosecution." (*Andrade v. Superior Court* (1996) 46 Cal.App.4th 1609, 1613 (*Andrade*).) "This result is unavoidable when sections 1054.3 and 1054.6 are read together." (*Ibid*.)

The foundational case governing the duty of witness disclosure is *Izazaga*, *supra*, 54 Cal.3d 356. There, our Supreme Court held that "the prosecution's right to discover defendant's witnesses under section 1054.3 is triggered by the *intent* of the defense to call that witness. Thus, the disclosure by the defense of its witnesses under section 1054.3 signals to the prosecution that the defense 'intends' to call those witnesses at trial." (54 Cal.3d at p. 375, original italics.) The *Izazaga* Court had no occasion to apply the pertinent statutory language—it was only called upon to address the facial constitutional validity of Chapter 10—but it did enunciate a governing standard: For both the defense (§ 1054.3, subd. (a)(1)) and the prosecution (§ 1054.1, subd. (a)), the Court announced, " 'inten[t] to call' " means that " 'all witnesses [a party] *reasonably anticipates it is likely to call*' " must be disclosed. (*Izazaga, supra,* at p. 375 & fn. 11.)[13]

1. *Raju's Legal Position That He Had No Duty Under Section 1054.3 To Disclose to the People Fletcher's Identity Or Statements Taken From Her Was Not Taken Without Good Cause Or Substantial Justification*

Until our decision today, no case has addressed whether a criminal defense lawyer in a multidefendant case is duty bound to disclose under section 1054.3 a witness he claims he does not intend to call, but reasonably anticipates a codefendant is likely to call. The trial court first addressed this issue on April 4, during Fletcher's testimony. On March 10, Goldrosen had disclosed Fletcher as his witness, and he later provided discovery concerning interview statements he and his investigator took from her. On

---

[13] "Although *Izazaga* . . . involved the requirements for disclosure by the defense under section 1054.3, rather than . . . by the prosecution under section 1054.1, the relevant language of both sections is identical. Given the 'manifest intent' of the electorate to create a reciprocal system of obligations . . . [the Court interpret[s] this aspect of the two statutes identically." (*Tillis*, *supra*,18 Cal.4th at p. 290, fn. 3, citation omitted; see *Izazaga, supra,* 54 Cal.3d at p. 375 ["the same definition [of 'intends'] applies to both the prosecution and the defense"].)

18

cross-examination by Trevisan, Fletcher testified that Raju and his investigator had interviewed her long before trial, and when she described her recollection of seeing a man wielding a gun running around immediately after the shooting, they "wrote it down." At a break in Fletcher's testimony on April 4, there ensued a colloquy outside the presence of the jury as to whether any notes from Raju's interview of her were discoverable under section 1054.3, even though he did not call her as a witness and disclaimed ever having any intention to do so.

With no clear guidance on the discovery obligations of defense disclosure in co-defendant cases, Raju took the position he had no independent obligation to disclose a witness statement taken by his investigator from Fletcher, a witness called by Lemalie, until she gave testimony inconsistent with that statement, thus requiring him to call his investigator for impeachment. Citing *Tillis*, *Hubbard*, *Andrade*, *Wade*, and *Izazaga*, Raju insisted that any obligation he had to make disclosures about Fletcher would not ripen until he announced an intent to call her as his own witness or cross-examined in the same area that Trevisan had covered. Until then, he contended, his duty of loyalty to his client obligated him not to make any disclosures about Fletcher.

The trial court rejected this position, citing the general discussion of relevance in a criminal discovery treatise, the overall purpose of Chapter 10 to promote the truth-seeking process, and specifically relying on *Littlefield* as it ultimately did again in its post-trial sanctions order. Over a work product objection from Raju, the court ordered him to produce the notes, explaining its ruling as follows: "I think those notes should be given over . . . . [¶] . . . [¶] It's not Ms. Trevisan's witness. It, candidly, is your witness, although Mr. Goldrosen happened to call your witness. [¶] . . . [¶] Quite frankly, you're the one that first came up with this witness months ago. [¶] . . . [¶] This has been your witness until Mr. Goldrosen got wind of it. [¶] . . . [¶] Mr. Raju, what I don't think you get to do is witness after witness have them and hope that Mr. Goldrosen is going to call them, and then you can 'cross examine,' and I'm saying that in quotation marks[,] [¶] . . . [¶] and not be required to give over your discovery that I think you're required to give over by the statute. [¶] . . . [¶] I've made my record, and I'm just going down looking at

19

the purpose of the statute, looking at what happened.  I re-read the questioning of the witness, and that's where I am."

For purposes of criminal discovery under Chapter 10, core "thoughts and impressions" work product is exempt from section 1054.3 disclosure.  (*Izazaga*, *supra*, 54 Cal.3d at p. 382 & fn. 19), just as it is in civil discovery.  (*Coito v. Superior Court* (2012) 54 Cal.4th 480, 496 (*Coito*); Code Civ. Proc. § 2018.030, subd. (a).)[14]  Although some redactions to Kingston's interview notes appear to have been made to protect core work product from disclosure, we have serious doubts whether the court was right to order the notes turned over.  Absent proof that Raju reasonably anticipated a likelihood of calling Fletcher (*Izazaga, supra,* 54 Cal.3d at p. 375), he was no more obliged to turn over these notes than he was to disclose investigative notes summarizing the interview statement of a prosecution witness taken by a defense investigator for impeachment purposes.  (*Hubbard*, *supra*, 66 Cal.App.4th at p. 1170 ["[t]here is no rule of law that would require the defense to disclose evidence gathered by an investigator who may tentatively be called by the defense for impeachment purposes"]; see *Izazaga*, *supra*, 54 Cal.3d at p. 377, fn. 14.)  Simple relevance, which was the focus of court's reasoning, with its emphasis on the fact Fletcher's credibility was in issue once she took the stand, was not enough to justify compelled disclosure.  While, to be sure, the order compelling turnover

---

[14] The key difference is that the weaker form of protection, the qualified work product privilege, Code of Civil Procedure section 2018.030, subdivision (b), is not available in the criminal setting.  "[S]ection 1054.6 expressly limits the definition of 'work product' *in criminal cases* to 'core' work product; that is, any writing reflecting 'an attorney's impressions, conclusions, opinions, or legal research or theories.' Thus, the qualified protection of certain materials under [former] Code of Civil Procedure section 2018, subdivision (b) [now § 2018.030, subd. (b)], applicable in civil cases, is no longer available in criminal cases. The more recent statute limiting the definition of work product in criminal cases carves out an exception to the older work product rule applicable to civil and criminal cases alike." (*Izazaga*, *supra*, 54 Cal.3d at p. 382, fn. 19.)

of the investigator's notes on April 4 is not directly at issue on this appeal,[15] the underlying rationale for the court's ruling on the notes—whether Fletcher was, in reality, Raju's witness—*is* presented. The same reasoning underlies the sanctions order. Because we reject that reasoning as flawed, as we explain in more detail below (see Section II.D.1-4., *post*), a fortiori we cannot say the position Raju advocated against it was so significant a departure from existing law that it may be deemed "without good cause or substantial justification" under Code of Civil Procedure section 177.5.

The concluding paragraph of the sanctions order recites the phrase "without good cause or substantial justification," but never examines what those words mean. Giving content to the phrase "without good cause or justification" in the criminal discovery context requires us to bear closely in mind, as the Supreme Court cautioned in its seminal decision in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 (*Marriage of Flaherty*), that a balance must be struck "that will ensure both that indefensible conduct does not occur and that attorneys are not deterred from the vigorous assertion of clients' rights." (*Id.* at p. 648.) If courts are too quick on the trigger with money sanctions against advocates, as the Court cautioned in *Marriage of Flaherty*, it "would inject undesirable self-protective reservations into the attorney's counselling role," and prevent counsel from devoting their entire energies to their clients' interests." (*Id.* at p. 647.) The Legislature signaled a sensitivity to these concerns by including an "advocacy" exception to Code of Civil Procedure section 177.5.[16] It seems to us that the balance struck in *Marriage of Flaherty*, though expressed in the civil context, is even more important in the criminal arena, where

---

[15] The OSC does not cite failure to comply with the April 4 order to turn over Kingston's notes as a basis for potential contempt or sanctions. Nor does the sanctions order rely on failure to comply with that order as a basis for imposing sanctions.

[16] "This power shall not apply to advocacy of counsel before the court." (Code Civ. Proc. § 177.5.)

the duties of counsel, on both sides—prosecution and defense—go beyond mere pursuit of private interests, and often involve adherence to constitutionally imposed duties.[17]

For help in interpreting the phrase "without good cause or substantial justification," *Marriage of Flaherty* is perhaps the most important guidepost, but there is additional, more specifically pertinent civil authority to draw upon as well. A number of civil statutes use the language "without substantial justification" as a trigger for fee awards against counsel (see *Tetra Pak, Inc. v. State Bd. of Equalization* (1991) 234 Cal.App.3d 1751, 1763, fn. 5 ["[t]he phrase is enjoying quite a vogue as the benchmark for sanctions"]),[18] and under those statutes courts have consistently held that the term " '[s]ubstantially justified' " means " 'not necessarily a prevailing position' but one which is 'justified to a degree that would satisfy a reasonable person' or . . . has a ' "reasonable basis both in law and in fact." ' " (*Lennane*, *supra*, 51 Cal.App.4th at pp. 1188–1189.) Indeed, where "reasonable minds could . . . differ," an accused attorney's

---

[17] Cf. *Strickland v. Washington* (1984) 466 U.S. 668, 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."); see *People v. Ledesma* (1987) 43 Cal.3d 171, 215.

[18] Code of Civil Procedure sections 2023.030, subdivision (a) and 2023.010, subdivisions (g) and (h) (sanctions for discovery misuse under Civil Discovery Act); see *Doe v. United States Swimming, Inc.* (2011) 200 Cal.App.4th 1424, 1434; Code of Civil Procedure section 1028.5 (prevailing party attorney fee awards to small businesses in litigation with state regulatory agencies); see *Al-Shaikh v. State Dept. of Health Care Services* (2018) 21 Cal.App.5th 918, 930–931 (*Al-Shaikh*); Vehicle Code section 3050, subdivision (b) (sanctions for discovery noncompliance in administrative proceedings before Motor Vehicle Board); see *Nader Automotive Group, LLC v. New Motor Vehicle Bd.* (2009) 178 Cal.App.4th 1478, 1483; Revenue & Taxation Code section 19717 (standard establishing unavailability of cost award in tax litigation against State of California); see *Lennane v. Franchise Tax Bd.* (1996) 51 Cal.App.4th 1180, 1189 (*Lennane*); 28 United States Code section 2412(d)(1)(A)) (federal Equal Access to Justice Act standard for fee awards against the United States); see *Pierce v. Underwood* (1988) 487 U.S. 552, 556.

position will be deemed to be substantially justified. (*Id.* at p. 1189.) We adopt that standard here.

We have no trouble concluding that reasonable minds could have differed about whether, in this multiple defendant case, Raju had an obligation to disclose Fletcher under section 1054.3, at the time he delivered his opening statement or at any other point in this trial. In the face of considerable uncertainty in the law,[19] Raju took a legal position that was fully consistent with Rule 3.1 of the Rules of Professional Conduct of the State Bar of California. That rule has always permitted attorneys to urge a good faith extension of existing law, and, indeed, has recently been revised to recognize expressly the ethical propriety of positions taken by a criminal defense lawyer in service of an effort to "defend the proceeding by requiring that every element of the case be established"—which is precisely what the record shows Raju was attempting to do here in his pursuit of what he called a minimalist strategy, without putting on an affirmative case.

2. *The Trial Court Failed to Apply Izazaga Correctly*

The second problem we see with the sanctions order is that the trial court, while quoting the relevant language from *Izazaga* in a recitation of applicable law, and reiterating the *Izazaga* standard in its conclusion, did not apply the standard correctly. This is evident from the court's repeated paraphrase of *Izazaga* in the body of its analysis applying the law to the facts before it. Three times, it states that Raju's duty to disclose was triggered because he "reasonably anticipated" calling Fletcher, omitting any mention of whether it was "likely" he would call her. It is also evident in several of the factors

---

[19] *Diepenbrock v. Brown* (2012) 208 Cal.App.4th 743, 749 (error to impose monetary sanction against personal injury plaintiff for opposing requested protective order because, "while the court may properly have [found her opposition lacking in merit] . . . , the conflicting legal authority on an unsettled issue provided substantial justification for [her] position, negating the basis for the sanction order"); cf. *Al-Shaikh, supra,* 21 Cal.App.5th at pages 930–931 (rejecting contention that agency's position was taken with substantial justification and observing "this is not a case where the applicable regulatory law was unsettled or unclear").

23

the court took into account in drawing the conclusion Raju's duty to disclose had been triggered. Whether, for example, Raju knew that Fletcher had information that was potentially helpful to his client or could not be certain Goldrosen would call her says nothing about the likelihood he would need to call her. These things identify uncertainty, but do not go to likelihood. The difference between "possible" and "likely" is more than a nuance,[20] especially in a case where, as here, multiple witnesses might supply some or all of the critical facts a defendant needs. The level of uncertainty only rises in a multidefendant case with overlapping defenses, since, as here, each defendant will likely be interested in inquiring about different topics for different reasons, making it a practical impossibility to parse out the likely scope of an expected witness's testimony—and the range of permissible cross-examination—until the witness testifies.

In our view, the seven factors cited by the trial court in support of its sanctions order, singly and together, suggest at most that Raju knew it was possible his strategy of lying low and pointing Goldrosen to witnesses he knew possessed exculpatory information for Landers could fail, which *might*, at some point in the course of trial, depending on how the evidence came in, force him to call someone from Goldrosen's witness list. But what might occur at trial was not the issue here. Under *Izazaga*, the issue was whether, when Raju delivered his opening statement, Raju reasonably

---

[20] It is not an overstatement to say that the *Izazaga* "intent to call" standard marks a constitutional boundary. In that case, Chapter 10 was attacked as facially unconstitutional on the ground, among others, that its scheme of mandatory witness disclosure violates the Sixth Amendment because it has the effect of "chilling defense counsel's trial preparation." (*Izazaga*, *supra*, 54 Cal.3d at p. 379.) The challengers in *Izazaga* argued that "such discovery penalizes the defendant whose attorney is most vigilant in preparing the defense." (*Ibid.*) In rejecting that argument, the linchpin point the Supreme Court made was that "[u]nder the new discovery chapter, discovery is *limited* to relevant statements and reports of statements of defense witnesses and *conditioned upon the defendant's intent* to call the witnesses at trial. . . . The new discovery provisions [therefore] do not give the prosecution free reign over all defense files." (*Id.* at p. 380, original italics & italics added.) Because the Court's rationale turns on the "intent to call" standard, any dilution of the standard potentially raises anew the Sixth Amendment questions resolved in that case.

24

anticipated it was *likely* he would be calling Fletcher, someone who it is undisputed he evaluated as a problematic witness and his supervisor advised him not to call. By conflating "possibility" with "likelihood," the trial court determined, essentially, that Raju's claimed minimalist defense strategy was a sham designed to evade his discovery obligations. We cannot agree that it was.

As things played out at trial, Raju not only executed the strategy he claimed to be following, he was successful with it. The trial court seems to have interpreted what Raju did as an elaborate ruse designed to disadvantage the People by hiding Fletcher, but we fail to see how. Fletcher had already been disclosed as a trial witness before the Court entered its March 13 discovery order. And at trial, the thrust of Landers's defense—the most critical piece of which was that Eric Jones, not Solis, was the person running next to Landers in the video—came in through witnesses called by Goldrosen *other than Fletcher*. Thus, when, during the course of trial, Raju briefly called Fletcher as "his" witness at the court's invitation after it sustained a single objection for exceeding the scope of cross-examination during a brief re-cross—an episode discussed in more depth below (see Section II.D.3.c., *post*)—Raju's primary mission for Landers had already been accomplished. The handful of questions Raju posed to Fletcher at that point explored areas of detail relevant to the strand of his defense that was supportive of Lemalie's theory of provocation, but that added nothing material to his effort to expose Trevisan's interpretation of the video as flawed.[21]

---

[21] To be sure, the trial court found that Raju cross-examined Fletcher on certain background points he could not have known Goldrosen would ask about (such as Landers's age, his reason for being in the neighborhood, and his relationships with people in the neighborhood), all of which were apparently designed to humanize him and inoculate himself against any suggestion by the People that he too was a gang member. But the issue for Raju was not whether Goldrosen would ask Fletcher the questions Raju would ask on Landers's behalf. Rather, the issue was whether the subject matter opened for Raju's cross-examination—by Goldrosen's direct examination, and by Trevisan's cross-examination, collectively—would be broad enough to allow inquiry on Landers' behalf into these background matters. It is far from clear on this record how predictable that was in advance, as illustrated by the fact that, when Raju did explore them, Trevisan

3.      *The Trial Court's Sham Cross Examination Theory Is Not Legally Viable on This Record*

A third problem with the sanctions order is that it relies on the novel theory that a defense attorney's professed strategy of calling no witnesses and relying solely on cross-examination may be declared a fraud after the fact, thereby justifying the inference post-trial in a sanctions proceeding that any witness who was subjected to the attorney's "faux" cross-examination was "really" his witness for purposes of section 1054.3 all along, regardless of who called the witness to the stand, thus triggering exposure to sanctions.  As applied here, the notion is that Raju's "in-court conduct" (cross-examining Fletcher beyond the scope of direct in one instance) combined with his "statements" (repeated insistence that he, in fact, intended to elicit exculpatory evidence on cross examination), and the state of his pretrial knowledge (he had long known Fletcher had exculpatory information), provide a basis to infer that he must have intended to call Fletcher from the outset of trial.  Whatever viability this theory may have on some other record, we conclude that the findings the trial court made in support of it here, as a matter of law, do not make out a violation of section 1054.3.

a.   *The Cases on Which the Trial Court Relied:* <u>In Re Littlefield</u> *and* <u>People v. Jackson</u>

The trial court cites *Littlefield, supra,* 5 Cal.4th at page 136, a single-defendant case, where our Supreme Court found that a defense attorney's in-court conduct revealed his intention to call a witness, despite his protestations of uncertainty.  (*Ibid.*)  The witness in question, the only "person . . . whom the defense possibly would call as a witness at trial" (*id.* at p. 127), had appeared in court on the day set for trial.  When the trial was continued, defense counsel asked the court to order her back to court.  (*Id.* at p. 126.)  While constitutional challenges to Chapter 10 were still pending in the Supreme

did not view the inquiry as particularly material, because she made no motion to strike, and, except for a single instance, failed to object on exceeding the scope grounds.  In fact, her failure to object on scope grounds points to a separate defect in the sanctions order, which we discuss below.  (*See* Section II.D.3.c., *post*.)

Court, and without the guidance ultimately provided by that case (*id.* at p. 126), attorney Littlefield took the position that he had no obligation to acquire and disclose to the prosecution this witness's address. No such issue is presented here. Unlike the defendant in *Littlefield*, Landers was not forced to call any particular witness or go without a defense. He could reasonably expect an array of witnesses to be called, each presenting him with an opportunity to elicit favorable testimony by cross-examination. Nor is this a case in which defense counsel temporized about his intention. Raju was always definitive that he did *not* intend to call Fletcher, which was fully consistent with the objective circumstances at trial, since Goldrosen, in fact, subpoenaed her, and Goldrosen, in fact, called her.

The court also cites *Jackson*, *supra*, 15 Cal.App.4th 1197, another single defendant case, but overreads it. In *Jackson*, the defense in a drug possession case tried to call a previously undisclosed investigator to testify to a hearsay statement taken from a witness who claimed the drugs were hers, not the defendant's. The scenario there was a true ambush situation, since the defense had known about the witness statement for three months and the witness was called by surprise after the prosecution had rested. (*Id.* at p. 1200.) Presented on appeal was the trial court's decision to preclude the proffered witness under section 1054.5, subdivision (a), an issue the appellate court reviewed for abuse of discretion, but also for whether it violated the compulsory process clause of the Sixth Amendment. These two issues were discussed in separate sections of the opinion. (*Jackson*, *supra*, 15 Cal.App.4th at pp. 1203–1204.) The fact defense counsel knew well before trial that his surprise witness had exculpatory evidence—the aspect of the opinion the sanctions order relies upon—was central to the *Jackson* court's rejection of the defendant's compulsory process argument, but was nowhere mentioned in its statutory abuse of discretion discussion. (*Id.* at p. 1204.)

In the abuse of discretion section of the opinion, the appellate panel framed two issues, either one of which would have been sufficient for affirmance. First, was the omission willful, thus justifying preclusion of the proffered testimony as a sanction for nondisclosure? Second, did the state face such severe prejudice from surprise that no

remedy other than preclusion would suffice? (*Jackson*, *supra*, 15 Cal.App.4th at p. 1203.) The trial court in *Jackson* based its ruling on willfulness.[22]  Passing that issue, the appellate court grounded its affirmance on the alternative ground of prejudice.  (*Ibid.* ["Even if withholding the identity of the witness were not willful, lesser sanctions would not have been adequate. . . . The People would have been unduly prejudiced by admitting the testimony without an opportunity for cross-examination, and the integrity of the adversary process would have been compromised[.]".)  While acknowledging that "the factual scenario of this case is distinguishable from *Jackson*," the trial court in this case read *Jackson* as "persuasive in establishing that objective factors, such as the exculpatory nature of the evidence, can determine whether an attorney was intending to call a particular witness."  Suffice it to say that that is not what *Jackson* holds.  If anything, *Jackson* illustrates what is missing from the sanctions case made against Raju—any discernible prejudice to the People.

We fail to see what tactical advantage Raju stood to gain here, or did gain, by attempting to evade any discovery obligation to disclose Fletcher under the reciprocal discovery order, given the fact that, by March 13, Fletcher had already been disclosed as a trial witness for Lemalie.  The People could not have suffered any disadvantage simply because Raju failed to disclose her again.  In the weeks before trial, Trevisan knew Fletcher would likely testify and nothing stopped her from tracking Fletcher down or doing whatever else she needed to do to prepare for Fletcher's testimony.  This is not a case, as *Littlefield* was, involving a defense lawyer's willed ignorance of a witness's whereabouts, employed as a calculated means of blocking the People's pretrial access to the witness.  Nor did the way Raju handled the issue of disclosure suggest anything

---

[22] (See *Jackson*, *supra*, 15 Cal.App.4th at p. 1203 ["because the testimony was allegedly exculpatory, *the trial court* refused to believe defense counsel did not seriously consider calling the witness until moments before he did"], italics added.)  Notably, whether counsel "seriously considered" calling a witness at trial is a significantly diluted formulation of the proper test under *Izazaga*—whether counsel reasonably anticipated the likelihood of calling a witness.

28

deceptive or untoward.  He chose to inform Goldrosen of the existence of Fletcher (and subsequently of Wesley and Eric Jones) and helped locate these witnesses in order to further Landers's interests, knowing if he successfully steered Goldrosen toward calling them, they would be disclosed to Trevisan, which is in fact what happened.

There may have been considerable unpredictability to this type of defense strategy, since, if Goldrosen did not go along, Landers *might* be left with no choice but to call one or more of these witnesses for the critical fact, unique to his defense, that Solis was not the person seen running on the video tape, and he *might* be precluded from calling any of them.  But based on the circumstances known to Raju when he gave his opening—with Fletcher having been disclosed by Goldrosen, and with the chance Goldrosen could be convinced to disclose one or both of the Jones brothers as well—it is unreasonable to conclude he thought it was *likely* he would have to call any of these witnesses.  Both *Littlefield* and *Jackson* involved witnesses about whom, if the lone defendants in those cases did not call them at trial, there was no reason to expect anyone would.  It is an unexceptional proposition that a defendant with no recourse but to call a particular witness violates 1054.3 by delaying disclosure and unveiling the witness by surprise at trial (*Jackson*) or concealing the witness's whereabouts prior to trial (*Littlefield*).  But that rule has no applicability on the unusual facts of this multidefendant case.

      b.  *The Cases the Trial Court Overlooked: <u>Sandeffer v. Superior Court</u> and <u>People v. Tillis</u>*

More pertinent than *Littlefield* or *Jackson*, in our view, are two other cases— *Sandeffer v. Superior Court* (1993) 18 Cal.App.4th 672  (*Sandeffer*) and *Tillis*, *supra*, 18 Cal.4th 284.  The sanctions order does not consider *Sandeffer*, and cites *Tillis* only in passing, without discussion.  In *Sandeffer*, a Fourth District panel reversed an order compelling the production of information and reports of an expert before she was identified by defense counsel as a trial witness.  (*Id.* at pp. 674–675.)  Citing *Littlefield*, the *Sandeffer* court began from the premise that a trial court "may order defense counsel to produce information or materials the court reasonably finds have been improperly withheld, notwithstanding counsel's protestations to the contrary," but then emphasized

29

that "the determination whether to call a witness is peculiarly within the discretion of counsel." (*Sandeffer*, *supra*, 18 Cal.App.4th at p. 678.) "Even when counsel appears to the court to be unreasonably delaying the publication of his decision to call a witness," the court explained, "it cannot be within the province of the trial judge to step into his shoes," even where "the court… suffer[s] understandable annoyance at perceived violation by defense counsel of the discovery provisions of the act[.]" (*Ibid.*)

*Sandeffer* would be enough to justify reversal here on its own terms, since it calls for a degree of deference to defense counsel's discretionary judgment about whether to call witnesses. But even if we took a different view, we could not simply disagree with it, or look past it, as the trial court did. The Supreme Court embraced *Sandeffer* in *Tillis*, *supra*, 18 Cal.4th at page 293, upgrading it as precedent and adding another independent reason to reverse. *Tillis* involved a situation in which Stephen Pittel, a defense expert in a drug case, was confronted on cross examination with a prior arrest for drug usage. (*Id.* at pp. 288-289.) Defense counsel did not know about the arrest, claimed surprise, and took the position that the prosecutor breached his duty under section 1054.1 to disclose it as reciprocal discovery. (*Id.* at p. 289.) The Court of Appeal held that the prosecutor's mode of cross examining Pittel—which was so detailed it suggested a classic a setup for impeachment—was an objective circumstance allowing an inference that the prosecutor must have had " 'witnesses or statements of witnesses concerning the arrest' " that he was prepared to use in the event the Pittel denied it. (*Id.* at p. 291.) Reversing, the Supreme Court held that was conjecture, insufficient to warrant inferring from it that the prosecutor reasonably anticipated the likelihood of calling an impeachment witness. (*Id.* at p. 292.)

Central to the *Tillis* Court's reasoning was the holding in *Standeffer*, which it adopted as an appropriate rule of appellate review. The Court explained that "[t]o establish on appeal a violation of section 1054.1, subdivision (a), in failing to disclose a witness, the record must affirmatively demonstrate that a specific witness or witnesses were known to and intended to be called by the prosecutor, but were undisclosed to the defense as required by the discovery chapter." (*Tillis*, *supra*, 18 Cal.4th at p. 293.)

30

"Appellate courts should not engage in speculation about witnesses whose identity or existence is not demonstrated on the face of the record," the Court explained, "as any other conclusion threatens to invade counsel's discretion whether to call a witness." (*Ibid*.) Because Raju did not in fact call Fletcher as his witness and always maintained he never intended to do so, under *Tillis* his mode of cross-examining is insufficient to warrant the inference that he intended the opposite.[23] Even where it can be established that an examining attorney has valuable information that he may use at trial, speculation about how he might use it does not justify the conclusion that he reasonably anticipates the likelihood of calling any particular witness.

The circumstances here provide a good illustration why it is perilous to try to reverse-engineer what a defense attorney "must have intended" with respect the calling of witnesses based on exculpatory information the attorney knew at some specific point in time prior to trial. Raju's interest in proving facts he knew Fletcher had tells us very little about whether he intended to call her, or anyone else, to prove those facts. To assess that issue on this record, Raju's declared intent at the time he was alleged to have violated his obligations under section 1054.3 must receive the most weight under *Izazaga*, and to the extent *Littlefield* permits declared intent to be overridden, the compressed timeline and the unique contingencies Raju faced in this multidefendant case should be kept uppermost in mind. There was no murder charge against Landers and there was no herding theory to be dealt with at trial until early February 2014, when the People added it by amendment, *after* Kingston's interview of Fletcher in January 2014. As a result, to meet a theory he did not know was going to be tried until six weeks before trial

---

[23] The sanctions order in this case quotes a cautionary comment from the *Tillis* that "[t]he rule of appellate review we announce today does not license counsel to temporize about his or her intentions in the face of clear indications on the record that counsel in fact intends to call a particular witness." (*Tillis*, *supra*, 18 Cal.4th at p. 293.) What trial court overlooks, however, is that the affirmative holding in *Tillis* directly undercuts its theory that Raju's mode of cross examining may be used as evidence of his intent to call Fletcher.

commenced, Raju was required to undertake a rapid investigation of who was who in the surveillance video. While he was assessing the situation in the run-up to trial, Raju and his investigator met with Fletcher on February 26th and determined she could identify some of the people on the video, but found that she had difficulty staying focused.

In the end, Raju claims, he thought Fletcher was more helpful to Lemalie than to Landers. That gave him options. He could call Fletcher, or he could try to persuade Goldrosen to call her while continuing to investigate other leads. He chose the latter course, risky though it was. Ultimately, the call he made bore fruit when he found and relayed information to Goldrosen about the Joneses as well. Raju's pursuit of this strategy helped Goldrosen's client, *and* his own—the crucial evidence for Landers, unique to Landers' defense, came in through Wesley Jones under direct examination by Goldrosen—while at the same time ensuring that all witnesses with potentially exculpatory information on the misidentification issue were disclosed to the People as soon as a decision to call them was made. We see nothing nefarious here. Instead, what we see is a typically fast-moving, fluid series of investigative events, requiring close judgment calls on less than full information in the weeks before trial and continuing during trial itself. The *Sandeffer* rule wisely accommodates this type of situation.

      c. *The Sham Cross-Examination Theory Relied On By The Trial Court Is Unsupported by Substantial Evidence, And As Applied Here, Violates Due Process*

Not only is the trial court's theory of sham cross-examination inconsistent with *Sandeffer* and *Tillis*, it is unsupported by substantial evidence on this record. Save for a single occasion near the end of Fletcher's testimony, the People interposed no objections to the form of any of Raju's cross-examinations of any witness; nor did the trial court make any sua sponte rulings or give any admonitions warning Raju that his approach to cross-examination was improper. Given the total absence of any objective evidence to support the charge that Raju's claimed strategy of eliciting facts favorable to Landers on cross-examination was feigned, we must conclude that the one instance the court does

32

rely upon is too slim a reed to support the conclusion that that Raju recognized the need to call her from the outset.

Citing Evidence Code section 773, subdivision (b), the court found that "[a]ll of [Raju's] questioning of [Fletcher] was outside the scope of direct." We see nothing in the record to support that finding. Goldrosen, on direct, elicited from Fletcher that she lived at the intersection of Treat Way and Kamille Court, near 26th Street; that she recognized images on the video as having been taken in the area of that intersection; that she and Lemalie had grown up together in the neighborhood; that she recognized herself talking to her "God Auntie" on the video; and that there was a nearby park where, on the day of the shooting, she saw a "boy" who was always starting trouble, pointing a gun at "my mom and Dylan's grandmother." Trevisan, on cross, brought out that Fletcher had seen Landers "chilling" in the area that day, and that Landers, her nephew, who considered her his "favorite auntie[,]" had come to her house after the shooting.

Following up on various topics opened up by Goldrosen and Trevisan, Raju's cross-examination and re-cross examinations touched on the relationships with one another of various people living in the area (including Landers); how much Fletcher knew about Landers's personal background (such as his age, his job in the area, people he knew); the gun-pointing incident in a neighborhood park; whether Landers ever took "his little brothers" to the park where Fletcher's mother and grandmother were threatened; and, after showing Fletcher some photographs, whether she recognized the area in which the photos were taken as Kamille Court and Treat. He did not ask Fletcher about who was depicted running on the video tape.

For most of Raju's cross-examination, neither Trevisan nor Goldrosen objected on grounds that Raju's questions went beyond the scope of direct, and Goldrosen never did. The first and only such objection, by Trevisan, came near the end of the final round of cross examination and re-cross examination of Fletcher on April 9. During this final round of questions, Trevisan elicited details about the gun-pointing threat to Fletcher's mother and Grandmother, a threat which was carried out by a man dressed in a white sweater and a hood. At that point, Raju conducted a third round of re-cross examination,

33

which he began by drawing Fletcher's attention to her prior testimony about "the person that you identified with what you described as a white sweater with a hoodie [who] pointed a gun at your mom and grandmother." Then, referring Fletcher to a photograph, he asked "Do you know what Dylan's grandmother looks like?"[24] It was here that Trevisan objected for the first time on scope grounds, arguing that "[t]his is far beyond the scope of direct or cross," despite the fact that, quite plainly, Raju was following up on a topic that had just been explored by her that day in completing her cross-examination.

Even if it were clear, contrary to what the record shows, that "[a]ll of [Raju's questioning of [Fletcher] was outside the scope of direct," as the trial court found—without reference to any particular questions—Evidence Code section 773, subdivision (b), cited by the court, does not address the crucial issue here. While it is true that Raju's interest in Fletcher was not adverse to Goldrosen's, establishing an adverse relationship only governs the *form* of questioning (i.e., instead of being able to ask leading questions of the witness during cross, counsel may be required to observe the same rules that are applicable to a direct). (See Evid. Code, § 773, subd. (b).) The purpose of Evidence Code section 773 is to regulate the manner in which examination proceeds. A single, isolated violation of its strictures as to form tells us nothing whatsoever about whether, at some previous point in a trial, or before trial, the examining attorney may be said to have "intend[ed] to call" the witness as his own within the meaning of section 1054.3.

Nor is it correct to say that because Raju accepted the court's invitation to call Fletcher on re-cross, he therefore called her in the sense of sponsoring her as a witness in support of an affirmative case for Landers. Fletcher was physically still on the witness

_____

[24] The significance of Raju's follow-up questioning about the issue of threats against Fletcher's mother and Dylan's grandmother at gun-point in the park had nothing to do with the issue of Trevisan's having mistaken the identities of the runners on the videotape, but instead lent further support to Goldrosen's theory of armed provocation. A subtheme Goldrosen's self-defense case, elicited by him from Fletcher and a number of other witnesses, was to portray Fuentes as someone who was known for indiscriminately threatening people in the neighborhood with a gun. To Goldrosen, it didn't matter whether the jury thought Lemalie felt threatened by Solis or Fuentes. They were both dangerous and potentially lethal, in his view of the facts for Lemalie.

34

stand, under circumstances where she had been called originally by Goldrosen, and she remained on the witness stand appearing to the jury as Goldrosen's witness during his brief direct. When Trevisan objected on scope grounds, there could have been many reasons why Raju felt compelled, at that moment, to say yes to the court's invitation. Raju may have believed, for example, it was more prudent to accede to the court's prompting rather than decline or engage in argument in in front of the jury. But to conclude that he saw this moment coming from the outset of trial, or at any point in time before his final re-cross of Fletcher, is an unsustainable proposition. That he had no need to ask about the single topic he saw as essential to his defense—the issue of who was depicted running on the video tape—by itself, is enough to refute the idea that he intended to call Fletcher for purposes of section 1054.3.

Though nearly eight decades old, *People v. Melone* (1945) 71 Cal.App.2d 291, the case cited by the trial court to support its sweeping, after-the-fact finding that Raju violated Evidence Code section 773, subdivision (b), is instructive. There, the trial court excluded testimony of a witness who was being cross-examined by the appellant upon finding that the testimony was collateral and not related to the direct examination, after opposing counsel lodged a vigorous objection on exceeding-the-scope grounds. (*Id* at p. 298.) In excluding the witness from testifying further, the court found the attorney was seeking to elicit, through the cross-examination of the witness, evidence that had no bearing on the real issue in the case. (*Ibid*.) None of the cross-examination questions at issue, the Court of Appeal held, went to "matters [that] were referred to on direct examination." (*Id*. at p. 299.) " 'A party who has not opened his case is not permitted to do so by propounding, under the guise of cross-examination, questions which relate, neither directly nor collaterally, to the subject matter of the original examination; if he wishes to propound such questions, he should, when permitted, call the witness as his own[,]' " subject to " 'the same rules as a direct examination.' " (*Ibid*.)

The trial court found that "[a]s in *Melone*, Mr. Raju tried to substantiate his case, under the guise of cross-examination [of Fletcher], with questions that did not relate to Mr. Goldrosen's direct examination." But unlike that case, when Trevisan finally

35

interposed a beyond-the-scope objection here, she did not seek an order barring further cross-examination, the remedy invoked in *Melone*. Rather, Raju chose the unremarkable course not to debate the matter and instead concluded his re-cross with a handful of questions in the form of direct examination, an option any experienced cross-examiner knows is an accepted way of meeting a scope objection—if it is permitted by the court, which it was here. The bottom line is this: We do not think it fair to infer from this fleeting episode that Raju intended all along to call Fletcher on direct, but we do think it fair to infer that, had there been a genuine basis to invoke the remedy of preclusion on grounds of prejudicial surprise, Trevisan would have requested it. She never did.

We hardly need point out that objections to the form of examination are forfeited unless asserted contemporaneously, which serves the salutary purpose of giving the court the opportunity to rule question-by-question—thereby producing a meaningful record for review—while giving the questioner notice of any defects in the mode of questioning, and an opportunity to cure. Arbitrarily bypassing this basic rule of forfeiture so that, after the fact, and without warning, the examining attorney may be sanctioned for failing to disclose a witness he claims he never intended to call, and did not call, goes beyond the accepted norms of trial practice Raju may be charged with knowing. It also produced effectively unreviewable findings, since we have nothing but a sweeping conclusion that we cannot test against anything in the record, except by guess. In addition to all of the other flaws identified above, we must therefore conclude not only that the sham cross-examination theory lacks support in the record, but as applied here it violates due process. (See *Marriage of Flaherty*, *supra*, 31 Cal.3d at p. 654 ["Due process, fundamental fairness and the integrity of our judicial system all require that counsel be permitted to pursue their clients' interests with the confidence that they will not be singled out at random for sanctions."].) Levying sanctions on this ground may not have been as random as the proverbial bolt from the blue, but it was close.

36

4.      *Raju Had No General Obligation to Disclose Exculpatory Information He Expected to Come From Witnesses Called by Lemalie.*

The final link in the chain of reasoning on which the sanctions order rests is the trial court's finding that "Raju hoped to circumvent the court's [reciprocal discovery] order by arranging for Goldrosen to contact Ms. Fletcher and include her on his witness and list.  This, he believed, enabled him to thwart his discovery obligations and elicit evidence under the guise of cross-examination."  To support its conclusion that Raju's efforts to have Goldrosen call Fletcher amount to sanctionable discovery abuse, the court relied heavily on findings concerning what Raju knew about Fletcher prior to trial, how he knew it, when he learned it, his assessment of its importance to his defense of Landers, and the steps he took to facilitate Goldrosen's interview of Fletcher, which were the very circumstances Raju and Goldrosen shared with the court on a confidential basis, in camera, on March 28.

At the time Raju delivered his opening statement—and at the time the court first adopted its sham cross-examination theory, on April 4 (see *ante*, pp. 19–20)—what he knew about Fletcher, his view of her as a witness, and his communications with Goldrosen about her, all constituted core "thoughts and impressions" work product, protected from discovery under section 1054.6 and Code of Civil Procedure section 2018.030, subdivision (a).  During trial, well before Raju sought the unsealing of the March 28 in camera transcript and filed declarations revealing his strategic thinking in great detail, thus waiving any confidentiality protection at that point, the court expressed concern about Raju's failure to disclose to the People exculpatory information his opening statement revealed he knew, telling him "it's absolutely clear that you never provided possibly exculpatory information that you had[.]"

To the extent the court's March 13 discovery order purported to compel Raju to disclose to Trevisan all exculpatory information he knew Fletcher possessed, whether or not he had any intent to call her—which is what prong 4 of that order does, on its face— the sanctions imposed here under Code of Civil Procedure section 177.5 cannot stand because the underlying order went beyond the court's statutory authority, invading core

37

work product. The cases cited by the People as support of prong 4 of the reciprocal discovery order (*Lamb*, *supra*, 136 Cal.App.4th at p. 580, *Roland*, *supra*, 124 Cal.App.4th at p. 165) do not support the order in the breadth it was entered. It was undisputed in *Lamb* and *Roland* that the defense intended to call the witnesses at issue there. The question presented was whether the obligation to disclose statements taken from those witnesses could be evaded by the simple expedient of not writing anything down, an issue not presented in this case. Both courts, unsurprisingly, held that such gamesmanship violates the rule in *Littlefield, supra,* 5 Cal.4th 122, since it is indistinguishable from the ostrich-like posture taken in that case by attorney Littlefield toward a witness his client had no choice but to call.

It may well be the case, indeed we have no doubt it is the case, that Trevisan was intensely curious about how and why in opening statement Raju displayed such a detailed knowledge of the evidence to come. But her felt need to know what Raju knew provided no basis to expect the disclosure of his storehouse of investigative knowledge. (Code of Civ. Proc. § 2018.020, subds. (a), (b); *Coito*, *supra*, 54 Cal.4th at p. 496.) The reason Raju was so confident Solis was not to be seen on the video clip Trevisan showed the jury in her opening statement may have been simply that he was a 49ers fan and knew the numbers of the jerseys he saw, while she did not; or perhaps it was due to Raju's investigative industry and effort; or maybe he had prior relationships with people in the neighborhood from past cases, even a past client. In the end it does not matter how he came to know what he knew. On this record, he had not obligation to disclose any of it, since there was no legally or factually supportable basis on which to conclude he reasonably anticipated a likelihood of calling Fletcher at trial.

**E.**     ***Raju's Omissions During the In Camera Hearing***

A major theme in the People's defense of the sanctions order against Raju is that Judge Bouliane simply found his repeated claims that he had no intention to call Fletcher unworthy of belief. At the in camera hearing, Raju represented that all he knew about the Jones brothers came from someone named Talika, one of Goldrosen's witnesses; Raju

38

further stated he did not even know Talika's last name,[25] that Talika identified Wesley in the video, and that she knew the person next to him was his brother. Raju stated, "*That's all the information she had, and that's all the information I have*, so it's something I'm getting through cross-examination." Raju told the court he had "no interest" in calling these individuals as witnesses and that any information he needed he would get through cross-examination.

Commenting pointedly on these statements, Judge Bouliane found in her sanctions order that what Raju represented was all he knew, in fact, was not "all the information he had." While making this representation, Raju did not disclose that following opening statements, his investigator had determined the identities of Wesley and Eric Jones from the license plate in one of the surveillance videos. Raju also did not disclose that he had met with Wesley on March 21 and that Wesley said that he and his brother had been threatened by Solis, who was armed, just before Solis ran toward Lemalie and was shot. Nor did Raju disclose that he had personally met with Talika on at least two prior occasions (implying he must have known she was named Fletcher); and that she told him that she saw a Latino, later identified as Fuentes, brandishing a gun shortly after the murder.

These are troubling omissions. Any misrepresentation to a court by an attorney, affirmatively or by material omission, is wholly unacceptable, especially where it occurs in camera. But we have no occasion to address that issue here. Because we find the sanctions order is flawed on multiple grounds, legal and factual, we need not reach the question whether any statements or omissions by Raju during the in camera hearing violated his duty of candor *to the court*. Under section 1054.3, we have concluded Raju did not have a duty to disclose all he knew about Fletcher to the *prosecutor* because, at the time of his opening statement, and at all points thereafter in the course of the trial, he

---

[25] Talika Fletcher is sometimes referred to as Talika Jones, her birth name, and sometimes as Talika Fletcher, since Fletcher is the surname of her late father. Her mother is Joyce Allen. She identified herself as Talika Fletcher at trial.

did not intend to call her, he did not reasonably anticipate any likelihood of calling her, and he did not have a general duty to disclose exculpatory information.

An adverse credibility finding based on the specific omissions the court highlighted in its sanctions order would not fill the legal and factual gaps in the rationale for imposing sanctions on this record. Without minimizing in any way the seriousness of the issue the People raise about the incomplete story Raju appears to have told the court in camera—an issue that potentially raises ethical concerns that are more serious in kind than simple discovery abuse—all we need say is that lack of candor with the court, at the in camera hearing or on any other occasion, was not the basis of the OSC or the sanctions order.

### III.    DISPOSITION

The order imposing sanctions against Manohar Raju in the amount of $950 is reversed.

_____
Streeter, Acting P.J.

We concur:


_____
Reardon, J.[*]


_____
Lee, J.[**]


A145037/*People v. Landers* (*Raju*)

_____

[*] Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[**] Judge of the Superior Court of California, County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

41

A145037/*People v. Landers* (*Raju*)

Trial court:          San Francisco City & County Superior Court

Trial judge:          Hon. Anne Bouliane

Counsel:

    Jeff Adachi, Public Defender (San Francisco), Matt Gonzalez, Chief Attorney, and Christopher F. Gauger, Deputy Public Defender for Objector and Appellant.

    Laura Arnold for California Public Defender's Association as Amicus Curiae on behalf of Objector and Appellant.

    Brendon D. Woods, Public Defender (Alameda), and Brian Bloom, Assistant Public Defender as Amici Curiae on behalf of Objector and Appellant.

    Elizabeth K. Barker, Supervising Attorney and Garrick Byers, Special Assignment Attorney for Alternate Defender Office of Contra Costa County as Amici Curiae on behalf of Objector and Appellant.

    George Gascón, District Attorney (San Francisco), Louise Ogden, Assistant District Attorney, and Joseph Frislid, Assistant District Attorney for Plaintiff.